United States Court of Appeals,

Fifth Circuit.

No. 91–1538.

Louis SCOTT, et al., Plaintiffs,

Louis Scott, Donald Smith and Elias Calhoun, Plaintiffs–Appellants,

v.

MISSISSIPPI DEPARTMENT OF CORRECTIONS, et al., Defendants–Appellees.

May 19, 1992.

Appeal from the United States District Court For the Northern District of Mississippi.

Before WISDOM, JONES, and SMITH, Circuit Judges.

WISDOM, Senior Circuit Judge:

The plaintiffs/appellants challenge the district court's summary judgment dismissing their claim that prison hair-grooming regulations violate their free exercise of religion under the First Amendment. Because the district court gave the plaintiffs sufficient notice of its impending summary judgment, and because that summary judgment was properly granted, we affirm.

I. BACKGROUND

The plaintiffs are inmates of the Mississippi State Penitentiary at Parchman. Each is a member of the Rastafari religion. Its practices, based on the Biblical vow of a Nazarite,[1] include smoking marijuana; eating a vegetarian diet; avoiding alcohol and grapes; gathering for communal worship; and never cutting or combing one's hair, but allowing it to grow in dreadlocks.[2] The regulation of

---

[1] *Numbers* 6:1–6. Verse five of that vow reads: "All the days of the vow of his separation there shall no razor come upon his head: until the days be fulfilled, in the which he separateth himself unto the Lord, he shall be holy, and shall let the locks of the hair of his head grow." Rastafarians, like Orthodox Jews, find additional support for their hairstyles in *Leviticus* 21:5: "They shall not make baldness upon their head, neither shall they shave off the corner of their beard, nor make any cuttings in their flesh." *See* Note, *Soul Rebels: The Rastafarians and the Free Exercise Clause,* 72 Geo.L.J. 1605, 1608, 1627 (1984).

[2] The Department does not contest the sincerity of the plaintiffs' beliefs or the religious nature of the Rastafarian faith.

the last is the subject of this appeal.

The Mississippi Department of Corrections issues a handbook of inmate regulations; it provides that

> Hair (male offenders) will be kept clean and neatly cut so the hair does not fall below the collar and is not longer than 3 inches in length. Sideburns will be trimmed even with, and not extend below the edge of the ear. Mustaches will be neatly trimmed at all times. Beards and goatees are not permitted for identification purposes.[3]

In enforcing this regulation prison officials have forcibly cut the plaintiffs' hair. The three Rastafarians contend that the regulation is an unconstitutional violation of their free exercise of religion. The district court disagreed and granted summary judgment in favor of the defendants. The prisoners appeal.

## II. DISCUSSION

A. Notice of Summary Judgment

The plaintiffs argue that the district court granted summary judgment without providing them sufficient notice; they contend that the court's order requesting additional briefing did not inform them of the harsh result—a denial of their case on the merits—it was contemplating. We disagree.

On May 27, 1988, the district court issued the following order:

> In view of the recent decisions by the United States Supreme Court in *Turner v. Safely* [*Safley,* 482 U.S. 78, 107 S.Ct. 2254], 96 L.Ed.2d 64 (1987), and *O'Lone v. Estate of Shabazz* [482 U.S. 342, 107 S.Ct. 2400], 96 L.Ed.2d 282 (1987), and the Fifth Circuit Court of Appeals in *Kahey v. Jones,* 836 F.2d 948 (5th Cir.1988), the court is considering the appropriateness of rendering a judgment on the merits, making submission of the case to a jury unnecessary. *See* Rule 50(a), Fed.R.Civ.P; *Boeing v. Shipman,* 411 F.2d 365 (5th Cir.1969).
>
> The parties are granted through June 30, 1988, to submit memorandum briefs on the

---

[3]Mississippi Department of Corrections, *Rules and Regulations Inmate Handbook,* Section III, Rule 6–6.

above-mentioned issue.

The district court's order failed to mention either the term "summary judgment" or Fed.R.Civ.P. 56, under which summary judgment is granted. Although the Supreme Court has noted that the standard for granting summary judgment "mirrors" the standard for granting a directed verdict under Rule 50(a),[4] and it was clear to all parties that the court could *not* at that point grant a directed verdict (because no jury had been empaneled), it is not necessary to equate Rule 50(a) and the *Boeing* standard with Rule 56 in order to find that the district court adequately notified the prisoners that it was, in effect, moving *sua sponte* for summary judgment.[5] The court, by stating that it was considering "rendering a judgment on the merits, making submission of the case to a jury unnecessary", made it clear that the court was was referring only to a summary judgment.

The court's order of May 27, 1988, sought additional briefing on the three leading cases affecting the merits of the plaintiffs' strongest claim. It gave them 30 days to respond. On June 13 the plaintiffs moved for an extension of time; clearly they knew that they bore a burden to respond to the court's earlier order. The court granted such an extension until July 29, 1988. The court did not ultimately grant summary judgment until March 30, 1989, ten months after issuing the May 27 order.[6] By that time the case had been pending for more than eight years. We encourage—we require—district courts to give parties full notice of a possible summary judgment against them; we will reverse such a judgment when the court fails to do so. Given the facts of this case, however, we find that the court did put the plaintiffs on notice that their briefs would bear the same burden borne in responding to a motion for summary judgment; the court's ultimate order granting summary judgment did not catch them unprepared.

[4]*Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 250–51, 106 S.Ct. 2505, 2511–12, 91 L.Ed.2d 202 (1986).

[5]The prisoners concede that a court may enter summary judgment *sua sponte* "provided the losing party has been given adequate notice and opportunity to respond." *Arkwright–Boston Mfrs. Mut. Ins. Co. v. Aries Marine Corp.,* 932 F.2d 442, 444 (5th Cir.1991).

[6]Fed.R.Civ.P. 56(c) guarantees the nonmoving party only ten days to oppose a motion for summary judgment before the court can rule on the matter.

B. Free Exercise of Religion

The Supreme Court has repeatedly emphasized the deference federal courts owe to state officials in their promulgation and enforcement of prison regulations when there is a need for penal authorities to have flexibility in the daily operation of a prison.[7]  At the same time penal authorities may need a hard and fast rule in dealing with certain continuing or recurring situations, even when that rule could be better tailored to the rights of individual prisoners through a court's flexible, case-by-case analysis.  In the words of Judge Alvin Rubin, "the free exercise clause does not entitle this court to substitute its knowledge for theirs".[8]

We are therefore prevented from scrutinizing a claim such as this with any real strictness. "When a prison regulation impinges on inmates' constitutional rights, the regulation is valid if it is reasonably related to legitimate penological interest."[9]  In this case the district court found that the hair-grooming regulations at Parchman were reasonably related to the prison's paramount security concerns.  We agree.[10]

It is important for a prison to record a clear and easily identifiable photograph of a prisoner upon his admission;  short hair makes the prisoner more easily identifiable at that point, and from that point onward:  during his term in prison and after any potential escape.  Long hair can be restyled or shorn to many different lengths, but short hair is harder to modify:  the prisoner will continue to look

---

[7]For example:  A court's "inflexible strict scrutiny analysis would seriously hamper [prison officials'] ability to ... adopt innovative solutions to the intractable problems of prison administration", *Turner v. Safley,* 482 U.S. 78, 89, 107 S.Ct. 2254, 2262, 96 L.Ed.2d 64 (1987), and would lead to the "unnecessary intrusion of the judiciary into problems particularly ill-suited to "resolution by decree'."  *O'Lone v. Estate of Shabazz,* 482 U.S. 342, 349–50, 107 S.Ct. 2400, 2405, 96 L.Ed.2d 282 (1987) (quoting *Procunier v. Martinez,* 416 U.S. 396, 405, 94 S.Ct. 1800, 1807, 40 L.Ed.2d 224 (1974)).

[8]*Kahey v. Jones,* 836 F.2d 948, 951 (5th Cir.1988) (Rubin, J., concurring).

[9]*Turner,* 482 U.S. at 89, 107 S.Ct. at 2261.

[10]Another panel of this Court has recently reached the same conclusion in a similar challenge to the grooming code in Texas prisons. *See Powell v. Estelle,* 959 F.2d 22 (5th Cir.1992) (per curiam).

like he did in prison for at least some time after escaping. We agree with the district court that a regulation requiring that a prisoner's hair remain short throughout his stay in prison is reasonably related to legitimate penological concerns of identification and security. "[I]t necessarily follows"[11] that MDOC's hair-grooming regulation does not violate the free exercise clause of the First Amendment.[12]

The *Turner* case provides four factors to assist a court's rationality review. Neither *Turner* nor *O'Lone,* however, *require* a court to weigh evenly, or even consider, each of these factors.[13] The district court did not err in failing to articulate a consideration of each of these factors. Nevertheless, because we review both the facts and law behind a summary judgment *de novo,* we shall mention those factors and briefly state why none weighs in favor of the plaintiffs.

Factor one is simply a restatement of the principle of rationality review: "[A] regulation must

---

[11]*O'Lone,* 482 U.S. at 353, 107 S.Ct. at 2407; *cf. Thorne v. Jones,* 765 F.2d 1270, 1275 (5th Cir.1985), *cert. denied,* 475 U.S. 1016, 106 S.Ct. 1198, 1199, 89 L.Ed.2d 313 (1986) ("[S]ecurity-related decisions of prison officials are to be reviewed only for reasonableness; if the decisions are rational (an exceedingly undemanding standard), courts are to look no further.").

[12]Faced with similar challenges to similar regulations, other appellate courts have agreed. *See Pollock v. Marshall,* 845 F.2d 656, 658–59 (6th Cir.), *cert. denied,* 488 U.S. 987, 109 S.Ct. 239, 102 L.Ed.2d 228 (1988); *Reed v. Faulkner,* 842 F.2d 960, 962 (7th Cir.1988); *Wilson v. Schillinger,* 761 F.2d 921, 926 (3rd Cir.1985), *cert. denied,* 475 U.S. 1096, 106 S.Ct. 1494, 89 L.Ed.2d 895 (1986). In each of those cases the plaintiffs also complained, under the equal protection clause, that the regulations in question had been inconsistently or discriminatorily enforced; we note that the appellants before us have not made such a complaint.

Those cases acknowledge several other reasonable justifications for prison hair-grooming regulations. Those justifications include: the prisoners' own safety; the uniformity of prison discipline; the risk that prisoners may conceal contraband in long hair; public health and safety concerns over infection and lice; and, somewhat improbably, the discouragement of homosexual activity. The plaintiffs introduced evidence into the record supporting these other justifications. We do not address them here because, like the district court, we find that the penological interests in safety and identification provide legally sufficient support for the regulation.

[13]In *O'Lone,* where the Court first applied *Turner* 's statement of the rule to a free exercise claim, the Chief Justice stated that "*Turner v. Safley,* drew upon our previous decisions *to identify several factors relevant to* this reasonableness determination." *O'Lone,* 482 U.S. at 350, 107 S.Ct. at 2405 (emphasis added).

have a logical connection to legitimate governmental interests invoked to justify it."[14]  As we have said, this is the controlling question posed by these cases;  the other factors merely help a court determine if the connection *is* logical.

Factor two looks to whether the regulation entirely stifles the prisoner's religious expression.[15] The Supreme Court has not stated that in such a case the regulation would be presumptively unconstitutional;  it merely recommends increased scrutiny of the Department's justifications when a regulation leaves the prisoner no other outward means of expressing his religion.  Although life in the Mississippi State Penitentiary denies to Rastafarians certain forms of expressing their religion (such as smoking marijuana and growing dreadlocks), it leaves other forms open.  They may still obey their diet, they may still be addressed by their Rastafarian name by other inmates, and they may still practice limited congregation, when their behavior in prison has not otherwise forced them into isolation.  This factor does not require us to declare the regulation unreasonable.

Factor three is the potential "ripple effect" of striking down the regulation.[16]  Rather than allowing prisoners to speculate that the ripple effect would *not* be great, the factor allows prison officials the opportunity to show what impact accommodating the prisoners' religious principles might have on their prisons.[17]  Although the district court did not weigh this factor, and did not have to do

---

[14]*O'Lone,* 482 U.S. at 350, 107 S.Ct. at 2405 (citing *Turner,* 482 U.S. at 89–90, 107 S.Ct. at 2262).

[15]*O'Lone* found alternative means even where the regulation in question entirely prevented certain prisoners from participating in one important form of Muslim religious expression:  "In *Turner,* we did not look to see whether prisoners had other means of communicating with fellow inmates, but instead examined whether the inmates were deprived of "all means of expression.' *Ante,* at 92 [107 S.Ct. at 2263], Here, similarly, we think it appropriate to see whether under these regulations respondents retain the ability to participate in other Muslim religious ceremonies.  The record established that respondents are not deprived of all forms of religious exercise, but instead freely observe a number of their religious obligations."  482 U.S. at 352, 107 S.Ct. at 2406.

[16]*Turner,* 482 U.S. at 90, 107 S.Ct. at 2262.

[17]In *Turner* the Court speaks of this factor not as imposing an additional burden on prison officials but as requiring even greater deference to those officials in certain cases:  "When

so, it would certainly not require a decision in the appellants' favor.

In factor four "the absence of ready alternatives is evidence of the reasonableness of a prison regulation". This factor also acknowledges that "the existence of obvious, easy alternatives may be evidence that the regulation is not reasonable, but is an "exaggerated response' to prison concerns."[18] The prisoners contend that there are many ready alternatives to the MDOC's hair-grooming regulation. We can imagine means of achieving the prison's stated goals with less restraint on the prisoner's rights. Nevertheless, we find it unlikely that all of the penological interests satisfied by the regulation could be equally well satisfied by any of the alternatives proposed by the prisoners. They have not pointed "to an alternative that fully accommodates the prisoner's rights at de minimis cost to valid penological interests",[19] and we therefore find in their argument as to factor four no additional evidence that the regulation fails the test of rationality.

In their reply brief the prisoners argue—for the first time—that the justifications offered for the hair-grooming regulation are presumptively unreasonable because the regulation applies only to men. Female inmates of Parchman, to whom the same concerns over identification and security might apply, are not required to cut their hair short during their time in prison. Or so the appellants tell us. Unfortunately, they have not proffered—nor did they introduce below—*any* evidence of what the grooming regulations for female prisoners at Parchman are. Because there is no evidence in the record against which we can measure this argument we cannot consider it. To our eyes no material

---

accommodation of an asserted right will have a significant "ripple effect' on fellow inmates or on prison staff, courts should be particularly deferential to the informed discretion of corrections officials." 482 U.S. at 90, 107 S.Ct. at 2262 (citing *Jones v. North Carolina Prisoners' Union,* 433 U.S. 119, 132–33, 97 S.Ct. 2532, 2541–42, 53 L.Ed.2d 629 (1977)).

[18]*Turner,* 482 U.S. at 90, 107 S.Ct. at 2262 (citing *Block v. Rutherford,* 468 U.S. 576, 587, 104 S.Ct. 3227, 3233, 82 L.Ed.2d 438 (1984).

[19]*Turner,* 482 U.S. at 91, 107 S.Ct. at 2262.

questions of fact remain,[20] and the regulation remains reasonable.

### III. CONCLUSION

We assume the plaintiffs' sincere devotion to their religion, and we appreciate the spiritual pain they suffer when prison officials forcibly cut their hair. This is more than cosmetic punishment. A Rastafarian's dreadlocks are a religious symbol of a bond with God that transcends and will outlast a prisoner's captivity in the new Babylon; here, however, the cropping of that hair is a temporal symbol of the crimes he has committed, which require his captivity in the Mississippi State Penitentiary. Although we could imagine a prison that feasibly accommodated the religious expression locked into a Rastafarian's hairstyle, it is not for us to impose our own ideas about prison management upon those who attempt the reasonable regulation of that nearly impossible task. The prisoners have indeed lost a right guaranteed by the Constitution, but the loss of absolute freedom of religious expression is but one sacrifice required by their incarceration; it is a sacrifice to the reasonable management of the penal order in which they now live.[21]

The plaintiffs received full notice that the district court was preparing to grant summary judgment against their free exercise claims, the only claims on appeal. The district court correctly applied the constitutional law that requires us to uphold an infringement of First Amendment rights when it results from a prison regulation that rationally matches a legitimate penological interest. We AFFIRM.

---

[20]"[A] complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986).

[21]A risk remains, and a suspician lingers, in such cases. The result that *O'Lone* virtually mandates here provides that facially neutral grooming regulations could be abused and selectively enforced as retaliation for inmate insubordination. Such discrimination would be intolerable. We still insist, and we remind prison officials, that inmates carry constitutional rights with them behind bars.