Douglas SPIES, Plaintiff–Appellant,

v.

George V. VOINOVICH, et al., Defendants–Appellees.

No. 97–4175.

United States Court of Appeals, Sixth Circuit.

Argued Oct. 27, 1998.

Decided April 14, 1999.

Rehearing and Suggestion for Rehearing En Banc Denied June 11, 1999.*

---

400

Alphonse A. Gerhardstein (argued and briefed), Laufman, Rauh & Gerhardstein, Cincinnati, OH, for Plaintiff–Appellant.

Robert C. Angell (argued and briefed), Office of Attorney General, Corrections Litigation Section, Columbus, OH, for Defendants–Appellees.

Before: BOGGS, SUHRHEINRICH, and MOORE, Circuit Judges.

BOGGS, J., delivered the opinion of the court, in which SUHRHEINRICH, J., joined. MOORE, J. (pp. 407–411), delivered a separate opinion dissenting in part.

## OPINION

BOGGS, Circuit Judge.

Douglas Spies appeals the dismissal of his First Amendment prisoner's rights action, which alleged that (1) various prison regulations violated his free exercise rights, and (2) prison officials retaliated against him for filing this lawsuit. Spies claims that the district court's determination that various prison policies that allegedly burden his right to free exercise of religion were reasonably related to legitimate penological interests, pursuant to the four-part standard in *Turner v. Safley*, 482 U.S. 78, 107 S.Ct. 2254, 96 L.Ed.2d 64 (1987), was in error. He also claims that the lower court erred by awarding appellees summary judgment on his retaliation claim. For the reasons that follow, we AFFIRM the trial court's grant of summary judgment on his free exercise claims, but REVERSE and REMAND the grant of summary judgment on his retaliation claim.

## I. FACTS AND PROCEDURAL HISTORY

Douglas Spies is an inmate at North Central Correctional Institution ("NCCI") in Marion, Ohio. He was ordained as a Zen Buddhist in December 1994, and was given the religious name of Gunaratna Sarika. After his ordination, Spies attempted to organize formal Buddhist worship at NCCI, and presented a formal request to the prison chaplains to start a group "chanting practice." He and another inmate were given permission by the chaplains to use the prison chapel on a weekly basis in order to meditate. The chaplains claim that they instructed the two inmates not to talk to or interact with each other during these meditative sessions; Spies claims that they were never so instructed.

Spies claims that from the time of his ordination through early 1996, he meditated with one or more fellow Buddhists in the chapel on a regular basis. He was given permission to use several religious articles during these meditative sessions, including a small statute of Buddha, an altar cloth, a picture of Buddha, a wooden sculpture of a fish, and incense. Spies kept some of these articles in his cell; others were stored on his behalf by the chaplains.

Spies also inquired several times to one of the chaplains about getting a community leader to come in and instruct those interested in Buddhism. The chaplain responded that, pursuant to prison policy, an outside leader could not come to NCCI to lead formal religious services until there were at least five Buddhist inmates at the facility. This prison policy was commonly referred to as the "rule of five." The chaplain, however, told Spies that he was permitted to have "a personal minister come in to instruct him." Hawley gave

Spies the address of a Buddhist prison ministry at a nearby temple and subsequently "wrote several letters from the department to the temple, informing them of an interest here in the institution."

In mid–1995, Spies filed a grievance with prison officials alleging that, because he was a Buddhist, the prison was required to provide him with a vegan[1] diet. One of the prison chaplains investigated his complaint by contacting the International Buddhist Meditation Center in Los Angeles, CA, which responded that veganism was not a required tenet of the Buddhist faith, although followers were requested to refrain from eating flesh. NCCI subsequently rejected his request, on the ground that "evidence does not support [Spies's claim] that this facility is required to supply [Spies] with a religious Vegan diet," although "this facility does offer inmates the ability to eat meat-free meals." On December 15, 1995, Spies filed a formal complaint seeking a court order requiring NCCI officials to recognize his dietary needs and his new religious name.

In early 1996, a prison chaplain indicated to Spies that the Buddhists' meditation sessions in the chapel, which consisted in part of group chanting, were in fact group worship services (*i.e.,* not simply several inmates meeting in the chapel to meditate independently and silently) and, thus, would have to cease until five Buddhist inmates at the facility were interested in having formal services. If five Buddhist inmates were to become interested, formal services could commence at NCCI as soon as a religious leader from outside the facility could be found to lead services.[2] The chaplain explained that Spies and other Buddhists "could indeed have private devotions, but they could not have a corporate experience without the appropriate supervision." Hawley made this decision in ac-

cordance with "the administrative policies under the provisions for inmate-led groups or inmate groups."

This same chaplain told Spies a few weeks later that Spies's religious articles could not be stored in his cell or by the chaplains, because the articles (1) presented a security risk; (2) could create liability concerns for the prison if stored by the chaplains; and (3) might spark other inmates to make allegations of favorable treatment towards Spies. Spies alleges that the chaplain said to him, "This is what you wanted with your lawsuit, isn't it?"

Spies subsequently amended his complaint, adding a claim alleging retaliation by prison officials that stemmed from the filing of his lawsuit. The district court granted defendants' motion for summary judgment on the ground that the regulations enforced by the prison officials (the "rule of five," prohibition of inmate-led groups, prohibition on possessing certain religious articles, and non-provision of vegan meals) did not violate his free exercise rights because they were reasonably related to legitimate penological interests and, thus, constitutional under *Turner v. Safley,* 482 U.S. 78, 107 S.Ct. 2254, 96 L.Ed.2d 64 (1987). The court, however, did not make explicit findings related to each part of the four-part *Turner* standard. Additionally, the court did not make any ruling on Spies's retaliation claim, apart from dismissing it with the rest of the complaint. Spies now appeals.

## II. ANALYSIS

### A. Spies's First Amendment challenges to various prison regulations

Spies claims that five policies at NCCI are unconstitutional because they violate his First Amendment right to free exercise of religion. He challenges NCCI policies

---

**1.** A vegan diet is a strict vegetarian diet pursuant to which the adherent consumes no animal-based food products, including dairy and egg products.

**2.** At oral argument, counsel for appellees indicated that formal Buddhist services began at NCCI in the spring of 1997, when a fifth Buddhist inmate at the facility indicated an interest in having services.

that: (1) require the existence of five documented members of a faith interested in forming a faith group before such a group is formed; (2) forbid him from keeping certain religious articles in his living area or in the chapel; (3) forbid the existence of inmate-led worship groups; (4) do not recognize his religious name; and (5) do not provide him with vegan meals.

■■■■ We review the district court's grant of summary judgment de novo. *EEOC v. University of Detroit,* 904 F.2d 331, 334 (6th Cir.1990). We must determine whether the pleadings, depositions, answers to interrogatories, and admissions "show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Canderm Pharmacal, Ltd. v. Elder Pharmaceuticals, Inc.,* 862 F.2d 597, 601 (6th Cir.1988). We do not endeavor to weigh the evidence; we need only determine whether there is a factual dispute that precludes summary judgment. *See Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

■■■■ The Supreme Court has instructed that "when a prison regulation impinges on inmates' constitutional rights, the regulation is valid if it is reasonably related to legitimate penological interests." *Turner v. Safley,* 482 U.S. 78, 89, 107 S.Ct. 2254, 96 L.Ed.2d 64 (1987). The *Turner* Court outlined four factors that are relevant in determining the reasonableness of a challenged prison regulation. "First, there must be a valid, rational connection between the prison regulation and the legitimate governmental interest put forward to justify it." *Ibid.* If not, the regulation is unconstitutional, and the other factors do not matter. *Id.* at 89–90, 107 S.Ct. 2254. Unlike the first factor, the remaining factors are considerations that must be balanced together: (2) "whether there are alternative means of exercising the right that remain open to prison inmates"; (3) "the impact that accommodation of the asserted constitutional right will have on

guards and other inmates, and on the allocation of prison resources generally"; and (4) whether there are "ready alternatives" available "that fully accommodate the prisoner's rights at de minimis cost to valid penological interests." *Id.* at 90–91, 107 S.Ct. 2254. It should be noted that Spies also makes claims under the Religious Freedom Restoration Act. These claims are without merit because the Supreme Court has declared that Act unconstitutional as applied to the states. *City of Boerne v. Flores,* 521 U.S. 507, 117 S.Ct. 2157, 2170–72, 138 L.Ed.2d 624 (1997).

■■■■ As a preliminary matter, we note that a trial court is not required to weigh evenly, or even consider explicitly, each of the four *Turner* factors. *See Scott v. Mississippi Department of Corrections,* 961 F.2d 77, 80 (5th Cir.1992); *see also Nobles v. Hoffman,* No. 92–2692, 1 F.3d 1244, 1993 WL 299333 at *2 (7th Cir.1993); *cf. Casey v. Lewis,* 4 F.3d 1516, 1522 (9th Cir.1993) ("we need not remand [to require a court to consider a *Turner* factor] because the resolution of this factual dispute in favor of the prisoners would not weigh heavily in our analysis."). Nothing in *Turner* nor in the case of *O'Lone v. Estate of Shabazz,* 482 U.S. 342, 107 S.Ct. 2400, 96 L.Ed.2d 282 (1987), in which the Supreme Court first applied the *Turner* standard to prison regulations allegedly infringing free exercise rights, requires a court to do so. In fact, the *O'Lone* decision simply states that *Turner v. Safley* "drew upon our previous decisions to identify several factors *relevant* to this reasonableness determination." *Id.* at 350, 107 S.Ct. 2400 (emphasis added). The four *Turner* factors are, therefore, simply "relevant" to the ultimate inquiry a court must undertake "when a prison regulation impinges on inmates' constitutional rights": determining whether a prison regulation is "reasonably related to legitimate penological interests." *See Turner,* 482 U.S. at 89, 107 S.Ct. 2254.

By creating the *Turner* test, the Supreme Court surely did not intend to pro-

vide a mechanism through which prisoners could mount repeated challenges to prison regulations and require courts to analyze, in detail, the impact such regulations would have in any particular factual setting, even if prior court precedent would seem to dictate the validity of the regulations. On the contrary: the Supreme Court's creation of the *Turner* standard was motivated by a desire to "ensure[ ] the ability of corrections officials to anticipate security problems and to adopt innovative solutions to the intractable problems of prison administration, and avoid[ ] unnecessary intrusion of the judiciary into problems particularly ill suited to resolution by decree." *O'Lone*, 482 U.S. at 349, 107 S.Ct. 2400 (quotation marks omitted). Penal authorities may need a clear rule for dealing with certain continuing or recurring situations, even when that rule could be better-tailored to the rights of individual prisoners through a court's flexible, case-by-case analysis. *Scott*, 961 F.2d at 80.

Thus, we need not remand Spies's free exercise claims to the district court to require the court to consider whether there are ready alternatives available to the regulations in question that fully accommodate the prisoner's rights at de minimis cost to valid penological interests. First, as we have just explained, a trial court is not required to weigh evenly, or even consider, each of the four *Turner* factors. Second, to require the trial court to do so would constitute a classic example of "unnecessary intrusion of the judiciary into problems particularly ill suited to resolution by decree" that the Supreme Court has warned against. *O'Lone*, 482 U.S. at 349, 107 S.Ct. 2400 (quotation marks omitted).

■■■ Finally, and most importantly, the "ready alternatives" part of the *Turner* test

is not a "least restrictive alternative" test: prison officials do not have to set up and then shoot down every conceivable alternative method of accommodat-

ing the claimant's constitutional complaint. But if an inmate claimant *can point to an alternative* that fully accommodates the prisoner's rights at de minimis cost to valid penological interests, a court may consider that as evidence that the regulation does not satisfy the reasonable relationship standard.

*Turner*, 482 U.S. at 90–91, 107 S.Ct. 2254 (citation omitted) (emphasis added). In other words, in order for a court to consider whether "ready alternatives" exist, a plaintiff challenging a prison regulation must first affirmatively argue the existence of a *specific* alternative. It is not the court's job to speculate about "every conceivable alternative method of accommodating the claimant's constitutional complaint." Thus, if a plaintiff has not "pointed to" a ready alternative, it would make no sense to require a trial court to make a definitive ruling on the existence of "ready alternatives."

Therefore, the district court did not err in failing to consider, with regard to some of the regulations at NCCI, whether "ready alternatives" to the regulations existed. However, because we review both the facts and law behind a grant of summary judgment de novo, we shall mention the *Turner* factors, when necessary, and briefly state why none weigh in favor of the plaintiff with regard to any of the prison regulations.

### 1. Group-of-five rule

■■■ NCCI policy requires that five documented members of a faith be interested in forming a faith group before such a group can be formed. In analyzing this regulation pursuant to *Turner*, we first agree with the district court that the group-of-five rule has a valid, rational connection to legitimate government interests in maintaining security and allocating prison resources. Second, we note that Spies had alternative means of exercising his free exercise rights; he was permitted to meditate privately in the chapel, correspond with fellow believers, and consult

individually with a personal minister if he so desired.

Third, we agree with the district court's finding that full accommodation of Spies's alleged free exercise right—allowing a group of any size to demand the use of limited prison resources—would have an adverse impact on the allocation of prison resources. Prison officials, no doubt, have an interest in regulating equitably the use of the prison chapel. Spies has failed to proffer any evidence that demonstrates that allowing any group, however small, to demand group services would not adversely impact the allocation of prison resources. Lastly, Spies has not pointed to the existence of ready alternatives available to the regulation in question that fully accommodate his rights at de minimis cost to valid penological interests, and it is not this court's job to speculate about every conceivable alternative method of accommodating the claimant's constitutional complaint. Thus, the consideration of the *Turner* factors leads us to conclude that NCCI's regulation requiring five documented members of a faith to be interested in forming a faith group is reasonably related to legitimate penological interests and, thus, constitutionally valid.

## 2. Religious articles

■ NCCI officials prohibited Spies from possessing certain religious articles in his cell on the ground that these articles could (1) be fashioned into a weapon or (2) be used to cover up illegal activity (*e.g.*, the burning of incense). Spies was prohibited from keeping the articles in the chapel, according to prison officials, because doing so would create safety concerns, liability issues, and would spark allegations by other prisoners that Spies was receiving favorable treatment by prison officials.

First, in light of the fact that the Supreme Court has counseled that "a prison's internal security is peculiarly a matter normally left to the discretion of prison administrators," *Rhodes v. Chapman*, 452 U.S. 337, 349 n. 14, 101 S.Ct. 2392, 69 L.Ed.2d 59 (1981), we believe that this regulation has a valid, rational connection to NCCI's security interests. Second, we note that Spies can nonetheless still freely exercise his religion without these items, for he has not contended that his religion *requires* the use of these articles during worship. Third, we believe that the prison was justified in worrying that these religious articles presented security concerns and, thus, that accommodation of Spies's request would have a negative impact on guards and other inmates. Finally, Spies claims that a "ready alternative" exists: permitting him to keep the articles in the chapel. We disagree, for this alternative does not come at a de minimis cost; we agree with NCCI that this alternative would require officers to take responsibility for the property of inmates, and would expose NCCI to allegations by other inmates of favorable treatment towards Spies.

We further note that courts have barred prisoners from having items in their cells or on their persons that have similar or greater constitutional significance than the items in question here. *See Hall v. Bellmon*, 935 F.2d 1106, 1113 (10th Cir.1991) (rejecting a First Amendment claim by a Native American that prison policy barring him from wearing a bear tooth necklace and medicine bag around his neck due to security concerns impinged on his religious freedom); *Friend v. Kolodzieczak*, 923 F.2d 126, 127 (9th Cir.1991) (holding that a prison regulation prohibiting inmates from possessing rosaries and scapulars in their cells did not violate the First Amendment). Therefore, we believe that the prison's prohibition on possessing these religious articles was constitutionally valid.

## 3. Need for a religious leader (no inmate-led groups)

■ NCCI's prohibition on inmate-led groups necessarily exists to avoid the risks that would arise from unsupervised inmate activity and the creation of an alternate, inmate-led power structure in the prison

and, thus, clearly has a valid, rational connection to NCCI's interest in maintaining prison security. *See, e.g., Cochran v. Schotten,* No. 97–3052, 1998 WL 898871 at *1 (6th Cir.1998) (restrictions on Hanafi Muslim inmates "did not violate [a Hanafi inmate]'s rights because documents in [the inmate]'s possession reflected that the group improperly sought to establish an alternative power structure within the prison and place[] inmates in authority over other inmates"). "The legitimacy of the Government's purpose in promulgating [safety] regulations is beyond question. The regulations are expressly aimed at protecting prison security, a purpose the Supreme Court has said is 'central to all other corrections goals.'" *Thornburgh v. Abbott,* 490 U.S. 401, 415, 109 S.Ct. 1874, 104 L.Ed.2d 459 (1989), quoting *Pell v. Procunier,* 417 U.S. 817, 823, 94 S.Ct. 2800, 41 L.Ed.2d 495 (1974). Moreover, consideration of factor (2) of the *Turner* test reveals that Spies had alternative means of exercising his free exercise rights, for he was permitted to meditate privately in the chapel, correspond with fellow believers, and consult individually with a personal minister if he so desired. Factors (3) and (4) of the *Turner* test also do not cut in favor of Spies, for he has also not demonstrated that the safety concerns of prison officials related to accommodating his requests are exaggerated and does not offer any "alternative means" by which prison officials can mollify their security concerns.

Spies argues that the existence of an Arabic class led by an inmate, but supervised by a chaplain, demonstrates that NCCI's ban on inmate-led groups is selectively enforced.[3] "However, a limited exception to a general rule, allowed under special circumstances, does not prove that the reasons for the rule were fabricated." *Pollock v. Marshall,* 845 F.2d 656, 659 (6th Cir.), *cert. denied,* 488 U.S. 897, 109 S.Ct. 239, 102 L.Ed.2d 228 (1988). Here, an

academic setting may not pose the same concerns as a religious grouping. Therefore, we believe that the prison's general prohibition on inmate-led groups was constitutionally valid.

### 4. Use of religious name

 Spies claims that prison officials violated his First Amendment rights by refusing to use his religious name. We need not even analyze this claim in light of *Turner,* for it is established in this circuit that Spies has no

> constitutional right to dictate how prison officials keep their prison records. As we see this issue, the present question of name change usage relates to prison administration. Absent unusual allegations such matters are for state prison officials to resolve. Intervention by the federal courts should only be in the very unusual case.

*Imam Ali Abdullah Akbar v. Canney,* 634 F.2d 339, 340 (6th Cir.1980), *cert. denied,* 450 U.S. 1002, 101 S.Ct. 1712, 68 L.Ed.2d 205 (1981). Moreover, the institutional records at the prison have indeed *been changed* to reflect his new name. Spies's claim has no merit.

### 5. Religious diet

 Spies's last claim is that NCCI's refusal to provide him with a vegan meal violates his First Amendment rights. We likewise need not analyze this claim in light of all four *Turner* factors, for we conclude that Spies has no First Amendment right to a vegan meal in this instance—he admits that "a vegan diet is not a requirement for Zen Buddhist practice." The prison has provided Spies with the *vegetarian* meal he is required to eat under Buddhist practice. As we noted in the unpublished case of *Williams v. Wilkinson,* No. 96–3715, 134 F.3d 373, 1997 WL 809971 (6th Cir.1997), "the fact that Plaintiffs dislike the alternate diet available does not render it unreasonable or legally

---

**3.** At oral argument, appellant's counsel contended that several other groups at NCCI are

also led by inmates. There is no evidence in the record, however, to back this assertion.

deficient." 1997 WL 809971 at *3. The prison provides Spies with a diet that meets his religious requirements and, thus, NCCI's refusal to provide him with a vegan meal is constitutionally valid.

The dissent states, at page 409, that "[i]t is not our role to determine whether a particular practice is a 'required' aspect of a religion." This contention is irrelevant, for two reasons. First, Spies *admits* that adherence to a vegan diet is not required under Zen Buddhist practice. *See* Appellant's Brief at 30. Thus, we need not make this determination in this case. Second, we note that Spies is only required to maintain a vegetarian (and not vegan) diet solely because it establishes that the prison has provided him an "alternative means of exercising" his religion under factor (2) of the *Turner* test. In other words, in pointing out that veganism is not required of Zen Buddhists, we are not stating that Spies's veganism is not a sincerely-held religious belief. Rather, we are stating that because the prison has already provided him with a vegetarian meal, we believe, in this instance, that the prison's decision to deny him a vegan meal is reasonably related to legitimate penological interests.

As we noted earlier, the Supreme Court's creation of the *Turner* standard was motivated by a desire to "ensure[ ] the ability of corrections officials to anticipate security problems and to adopt innovative solutions to the intractable problems of prison administration, and *avoid[ ] unnecessary intrusion of the judiciary into problems particularly ill suited to resolution by decree.*" *O'Lone v. Estate of Shabazz,* 482 U.S. 342, 349, 107 S.Ct. 2400, 96 L.Ed.2d 282 (1987) (quotation marks omitted) (emphasis added). The dissent urges that we remand this case to the district court so it can engage in factfinding to determine, for example, "to what extent [Spies's] nutritional needs could be met out of the prison's current food supply." We believe that this would be the type of "unnecessary intrusion of the judiciary"

into "problems of prison administration" that *O'Lone* warned against.

## B. Retaliation

Spies also claims that prison officials retaliated against him for the filing of his lawsuit. However, the trial court never ruled on the retaliation claim before it dismissed Spies's complaint. Since the district court never ruled on the merits of Spies's claim, we must remand it to the trial court, which should consider Spies's retaliation claim in light of our recent en banc decision in *Thaddeus–X v. Blatter,* 175 F.3d 378 (6th Cir.1999).

## III. CONCLUSION

The trial court's grant of summary judgment on Spies's free exercise claim is AFFIRMED. The trial court's grant of summary judgment on Spies's retaliation claim is REVERSED and REMANDED for further proceedings.

MOORE, Circuit Judge, dissenting in part.

Neutral prison regulations that are reasonably related to legitimate penological interests are permissible even if they infringe on an inmate's religious practices. *See O'Lone v. Shabazz,* 482 U.S. 342, 107 S.Ct. 2400, 96 L.Ed.2d 282 (1987) (applying to religion claims the standards articulated in *Turner v. Safley,* 482 U.S. 78, 107 S.Ct. 2254, 96 L.Ed.2d 64 (1987)). This standard allows prison officials wide latitude in evaluating their institutional needs, but it does not permit courts to abdicate their responsibility to protect religious freedom. While the majority acknowledges that the *Turner* standard is controlling, it then announces that we need not follow the Supreme Court's instructions and consistent example in applying that standard, accepts without question any justification for a regulation that prison officials can articulate, rejects claims on the grounds that

Sarika's [1] desired activities are not "required" by some centralized religious authority, and ignores evidence that some of NCCI's regulations are discriminatory as applied.

I concur in the results reached by the majority with respect to the retaliation claim, the "rule of five," and use of Sarika's new name. I believe, however, that Sarika has proffered evidence sufficient to raise a genuine issue of material fact as to the reasonableness of the refusal to provide a vegan diet, the confiscation of his religious objects, and the ban on inmate-led groups.

The standard articulated in *Turner* is that "when a prison regulation impinges on inmates' constitutional rights, the regulation is valid if it is reasonably related to legitimate penological interests." *Turner*, 482 U.S. at 89, 107 S.Ct. 2254. As the majority opinion indicates, the Supreme Court has identified four factors relevant to analyzing the reasonableness of such regulations. In cases following *Turner*, the Court's determination of reasonableness has involved careful evaluation of these factors in light of facts developed at trial. *See, e.g., Thornburgh v. Abbott,* 490 U.S. 401, 414–19, 109 S.Ct. 1874, 104 L.Ed.2d 459 (1989); *O'Lone,* 482 U.S. at 350–52, 107 S.Ct. 2400. Surprisingly, the majority announces that we need not pay much attention to these factors at all.[2] It

is certainly true that one or more factors may be insignificant in a particular case and that other concerns may be present that do not fit neatly within the *Turner* factors. For example, as the majority points out, the "ready alternatives" factor would not be helpful in a case where the plaintiff has failed to propose any method for accommodating his or her beliefs. It is also true that we would not reverse a district court's judgment solely because the court's opinion did not refer explicitly to each factor. The fact remains, however, that the Supreme Court has identified these four factors as the relevant ones for evaluating the reasonableness of prison regulations.

One aspect of *Turner* that the majority seems to dislike is that the inquiry it demands is often, of necessity, a fact-intensive one. While our review of prison rules is deferential, it is not a "toothless" review that merely requires the government to articulate some rationale for a rule. *See Abbott,* 490 U.S. at 414, 109 S.Ct. 1874. *Turner* requires us to consider and weigh the government's interests, the degree of infringement on religious practice, and the cost and feasibility of accommodation. In some cases, this inquiry will require a trial. The leading Supreme Court cases on this issue, such as *Turner* and *O'Lone,* were post-trial appeals, and the Court's analysis

---

**1.** Although the complaint styles the plaintiff "Douglas Spies aka Gunaratna Sarika," his allegations about the defendants' failure to use his new name and his own usage in his brief and deposition indicate that he prefers to be known as Sarika.

**2.** To the limited extent that the three cases cited by the majority support this proposition in theory, they contradict it in application. The Ninth Circuit case merely noted the possible existence of a factual dispute but held that summary judgment was nonetheless appropriate because the *Turner* test was satisfied even if one assumed the dispute would be resolved favorably to the plaintiffs. *See Casey v. Lewis,* 4 F.3d 1516, 1522 (9th Cir.1993). This is nothing more than a routine application of the standard for summary judgment, not a repudiation of the *Turner* factors. (In

fact, the court devoted a subsection of its opinion to each factor. *See id.* at 1520–23.) The Seventh Circuit's unpublished order stated that it would "focus only on the second factor as dispositive in this case" but actually discussed at least three of the four factors. *See Nobles v. Hoffman,* No. 92–2692, 1 F.3d 1244 (Table), 1993 WL 299333, *2 (7th Cir. 1993). Finally, although the Fifth Circuit's decision contains language very similar to the majority's, that court also went on to discuss each factor individually before making its final assessment of the reasonableness of the regulation. *See Scott v. Mississippi Dep't of Corrections,* 961 F.2d 77, 81 (5th Cir.1992). Clearly these three cases decided by courts outside this circuit do not and could not provide a legitimate basis for weakening Supreme Court precedent.

drew heavily from the factual evidence developed at trial. *See O'Lone,* 482 U.S. at 350–53, 107 S.Ct. 2400; *Turner,* 482 U.S. at 91–93, 97–99, 107 S.Ct. 2254.

Finally, the majority's discussion of the "ready alternatives" factor indicates that it is Sarika's obligation to point to a specific method for accommodating his complaint. I agree that it makes sense to expect the plaintiff to propose an accommodation. Once the plaintiff has done so, however, "it is the defendant's burden to establish affirmatively that accommodation of sincerely held religious beliefs is administratively impracticable." *Kent v. Johnson,* 821 F.2d 1220, 1225 (6th Cir.1987). The court will, of course, give due deference to prison officials' views on security and other matters within their expertise.

**Diet**

The majority rejects Sarika's request for a vegan diet on the grounds that his Buddhist beliefs do not *require* him to abstain from eating animal products. Courts are ill-equipped to act as arbiters of the tenets of religious faith. It is not our role to determine whether a particular practice is a "required" aspect of a religion. *See Hernandez v. Commissioner,* 490 U.S. 680, 699, 109 S.Ct. 2136, 104 L.Ed.2d 766 (1989) ("It is not within the judicial ken to question the centrality of particular beliefs or practices to a faith, or the validity of particular litigants' interpretations of those creeds."). In addition, the First Amendment does not provide greater protection for centralized religions with established sets of mandatory doctrines than it provides for less established or individual-based religions. *See Wilson v. National Labor Relations Bd.,* 920 F.2d 1282, 1285–87 (6th Cir.1990) (holding that statute violated Establishment Clause because it accommodated the "established and traditional tenets" of "bona fide" religions but not the sincerely held religious beliefs of ·individuals unassociated with established sects), *cert. denied,* 505 U.S. 1218, 112 S.Ct. 3025, 120 L.Ed.2d 896 (1992). If a prison regulation impinges on a sincerely

held religious belief, it is subject to the *Turner* standard regardless of whether the reference books or outside authorities consulted by NCCI agree that the practice in question is "required." *See Kent,* 821 F.2d at 1224–25 (holding that the threshold inquiry is whether the plaintiff has a sincerely held religious belief).

Obviously, a prisoner cannot succeed in challenging a prison regulation merely by asserting that it violates a religious belief. Whether the belief is religious and is sincerely held is a factual question that can be resolved in court. The *Turner* analysis can then take into account the degree of infringement on religious practice as compared to the burden that accommodating the practice would place on the prison. In this analysis, it is not necessary for courts to classify religious tenets as "required" or "not required." Indeed, a prison regulation can be valid under *Turner* even if it *does* prevent a prisoner from engaging in a required religious practice. *See O'Lone,* 482 U.S. 342, 107 S.Ct. 2400, 96 L.Ed.2d 282 (holding that prison could schedule work details so that Muslim inmates would miss Friday afternoon services that the Court described as "commanded by the Koran"); *Pollock v. Marshall,* 845 F.2d 656, 659–60 (6th Cir.) (holding that prison could forcibly cut inmate's hair, contrary to his religious beliefs), *cert. denied,* 488 U.S. 897, 109 S.Ct. 239, 102 L.Ed.2d 228 (1988). Similarly, the fact that a vegan diet is not "required" by Sarika's Buddhist faith does not end the inquiry into whether the prison's refusal to accommodate his practices is reasonable. *See Whitney v. Brown,* 882 F.2d 1068, 1070, 1073 (6th Cir.1989) (requiring prison to permit Jewish inmates from different prison complexes to gather for Passover Seder because "the whole point of a Passover Seder is a joint celebration" and a small one, though permissible under their faith, would be " 'a very miserable seder' ").

NCCI has a legitimate interest in keeping down the costs of providing special meals to particular prisoners, and the pris-

on has accommodated Sarika to the extent of providing vegetarian meals. Thus, the first two *Turner* factors weigh in favor of the defendants. Evaluation of the third and fourth *Turner* factors would require considering, for example, to what extent Sarika's nutritional needs could be met out of the prison's current food supply. In this case, however, the inquiry may be greatly simplified by the evidence of discrimination. NCCI has one Jewish inmate who keeps kosher, and it employs an outside caterer to provide meals for that inmate. J.A. at 478–79 (Hawley Dep.). The refusal to do the same for Sarika is important both because discrimination among religions is itself unconstitutional and because it is evidence that prison officials have found accommodating special diets to be administratively practicable.

The defendants' sole defense to Sarika's claim that he is entitled to a vegan diet is that veganism is not a "requirement of his faith group." Appellees Br. at 36. This defense is inadequate as a matter of law, and a prison official has admitted that NCCI provides special religious meals to an inmate of another faith. Sarika is entitled to demonstrate that accommodation of his own sincerely held beliefs would also not be an unreasonable burden on prison resources.

**Religious Articles**

Sarika would like to use the following objects in his religious practices: a small statue of the Buddha, an altar cloth, a pillow, a wooden fish, and a picture of the Buddha. He would also like to burn incense on occasion. The prison has forbidden him from keeping his worship items in his cell and has also refused to store them in the prison chaplain's office. Prison officials assert that the items present potential security risks and that storing the items could lead to accusations of favoritism from other inmates.

Here, too, evidence of discrimination creates a factual question about the explanations for denying Sarika these items. NCCI has about ten inmates who practice

Native American religions and who engage in weekly ceremonies that involve the burning of sweet grass or incense. J.A. at 479–80, 498 (Hawley Dep., Karlen Dep.). The grass or incense is provided by the institution, and the inmates are allowed to keep cigarette lighters, which they use to light it. J.A. at 480 (Hawley Dep.). Each inmate is also allowed to keep a headband, a medicine bag, tobacco, and a pipe. J.A. at 480 (Hawley Dep.).

Even with all possible deference to the expertise of prison officials, it is extremely difficult to see how an altar cloth or a small pillow poses a security threat but a lighter or a headband does not. The majority opinion simply relies on the defendants' assertion that Sarika's articles raise security concerns without taking into account the treatment of other prisoners or the particular facts of Sarika's situation. I could well understand deferring to the judgment of prison officials who opposed allowing inmates to have lighters among their personal possessions; some of the other items kept by NCCI inmates could also reasonably be prohibited. *Cf. Hall v. Bellmon*, 935 F.2d 1106, 1113 (10th Cir. 1991) (holding that prison could reasonably prohibit inmate from keeping a bear-tooth necklace and a medicine bag with a thong for wearing around the neck). However, NCCI, a minimum security facility, permits inmates to possess these items. It is far from obvious that Sarika's objects are more dangerous, and he has suggested that he could also be accommodated by keeping the items in the chaplain's office. A reasonable fact-finder could find that the prison's refusal to make any accommodation is unreasonable, and summary judgment was therefore inappropriate.

**Rule of Five**

I agree with the majority's conclusion that the "rule of five" does not itself violate Sarika's right to exercise his religion. The prison clearly needs to have some system for allocating space and time in the religious services area. Declining to organize

services for two or three Buddhists does not hamper Sarika's ability to practice his faith any more than the lack of formal services hampered him when he was the only Buddhist. I note, however, that some of Sarika's allegations suggest NCCI may have wrongly cut off alternative means of worship. For example, prison officials may have restricted Sarika and other Buddhists' chapel access even during open hours when no particular group had the chapel reserved. In addition, officials may have restricted the ability of the Buddhists to gather informally, as other inmates might gather to play a game of cards. These allegations, however, are appropriately dealt with pursuant to Sarika's retaliation claim or his claim about the ban on inmate-led groups. To the extent that he complains about the rule of five as a method for allocating resources in the religious services area, I concur in the result reached by the majority.

**Inmate–Led Groups**

Before the arrival of a fifth Buddhist and identification of a volunteer outside leader, Sarika and his fellow Buddhists sought to organize their own worship and study sessions. It appears that although they now have formal services, they would like to be able to meet more frequently and under their own leadership. The defendants say that such meetings would violate their rule against inmate-led group activities.

The majority accepts the defendants' argument that the ban on inmate-led groups is necessary "to avoid the risks that would arise from unsupervised inmate activity and the creation of an alternate, inmate-led power structure in the prison." *Ante* at 406. I must first point out that Sarika has not asked for the right to engage in unsupervised activity. He compares his desired activities to an Arabic class led by Muslim inmates but supervised by Hawley, who does not speak Arabic. J.A. at 480–81 (Hawley Dep.). Like the Muslim inmates in the class, Sarika and the other Buddhists seek the opportunity to help each other with their religious development in the absence of an outside leader but under the supervision of prison staff.

There is some merit to the majority's argument that NCCI could reasonably distinguish between an academic setting and a religious one, as the latter may be more conducive to establishing some inmates in positions of authority over others. Whether that distinction is operative in this case, however, is a close issue and one that I believe should be determined by a fact-finder. Although the Arabic class is in some sense an academic setting, it is clearly linked to religion—the participants are Muslim, apparently interested in learning Arabic for religious purposes, and the classes take place in the religious services center. Any security risk inherent in this arrangement is enhanced by the fact that the prison official supervising the activity does not understand the language being spoken. In addition, Muslim inmates are permitted to conduct their own weekly prayer service if their outside leader is absent. J.A. at 480 (Hawley Dep.). This evidence concerning NCCI's treatment of another religious group is sufficient to raise a question of fact regarding whether its restrictions on Buddhist worship and study are unreasonable.

**Conclusion**

I would reverse the grant of summary judgment on Sarika's claims regarding diet, religious articles, and inmate-led groups and remand for further proceedings consistent with this opinion. Therefore, I respectfully dissent in part from the majority opinion.