Jason WILSON, Plaintiff,

v.

Michael W. MOORE, Tyrone Boyd, Charles Mask, Wilson Mears, and Michael Silcox, Defendants.

No. 4:98CV328–WS.

United States District Court, N.D. Florida, Tallahassee Division.

May 1, 2003.

David Croft, Belle Glade, FL, Pro se.

Jason Wilson, Jasper, FL, Pro se.

Donna Marie Laplante, Esq., Caryl Sue Kilinski, Esq., Attorney General Civil Div—Tallahassee FL, Tallahassee, FL, for Defendants.

## ORDER ADOPTING THE MAGISTRATE JUDGE'S NINTH REPORT AND RECOMMENDATION

STAFFORD, Senior District Judge.

Before the court is the magistrate judge's ninth report and recommendation (doc. 219) docketed March 11, 2003. The magistrate judge recommends that the defendants' motion for summary judgment be granted in part and denied in part. The plaintiff has not filed objections to the report and recommendation.

Upon review of the record, the court has determined that the report and recommendation should be adopted.

Accordingly, it is ORDERED:

1. The magistrate judge's report and recommendation is ADOPTED and incorporated by reference into this order.

2. The plaintiff's claims for injunctive and declaratory relief are DISMISSED as moot.

3. The defendants' motion for summary judgment (doc. 85) is DENIED to the extent the plaintiff seeks nominal damages for alleged violations of his equal protection rights. The defendants' motion for summary judgment (doc. 85) is GRANTED in all other respects.

4. The court declines to exercise supplemental jurisdiction over the plaintiff's state law claim because such claim raises unsettled issues of Florida law. The plaintiff's state law claim is accordingly DISMISSED.

4. The case shall be REMANDED to the magistrate judge for further proceedings on the remaining equal protection claim.

## NINTH REPORT AND RECOMMENDATION

SHERRILL, United States Magistrate Judge.

This case is before the Court upon an order of remand from the Eleventh Circuit Court of Appeals directing this Court to revisit the summary judgment motion in light of the fact that Plaintiff's evidentiary materials were not considered. Doc. 207. Because of the lengthy period of time that had passed since ruling was issued on the original summary judgment motion, the parties were advised that the record would be reopened "for submission of any additional evidence in support of, or opposition

to, summary judgment." Doc. 208. Only Plaintiff provided additional materials. Docs. 213, 215. In ruling on the summary judgment motion at this time, the following relevant documents will be considered: Defendants' special report [1] and attached exhibits, doc. 85; Plaintiff's response to summary judgment, doc. 141, with attached exhibits; Plaintiff's supplemental memorandum in opposition to summary judgment with attachments, doc. 213, and Plaintiff's supplement with an additional affidavit, doc. 215.

## I. Preliminary matters

There are a number of issues that may be adjudicated at the outset. Between the time judgment was entered, doc. 178, and a ruling on the appeal was entered, co-Plaintiff David Croft voluntarily dismissed his claims. Docs. 191, 195, 198, 199, and 203. Therefore, the appeal was taken only by Plaintiff Jason Wilson and in revisiting summary judgment, only claims pertaining to Plaintiff Wilson will be considered. Accordingly, Michael Silcox's only involvement in this case was as a Defendant to claims raised solely by Plaintiff Croft. Thus, summary judgment should be granted in Defendant Silcox's favor.

Additionally, the order of remand upheld the appropriateness of granting summary judgment on the claim concerning prison regulations imposing hair length requirements on all prisoners. Doc. 207, p. 19. Thus, this report and recommendation will not address that claim other than to recommend that Defendants' motion for summary judgment be granted as to that claim.

Furthermore, Plaintiff abandoned his claim brought under 18 U.S.C. § 241. Doc. 207, p. 24, n. 18. Thus, only Plaintiff's claims under 42 U.S.C. § 1983, § 1985, and § 1986 will be addressed. Depending

---

1. The special report was construed as a motion for summary judgment. Doc. 88. Hereinafter, the report will be referenced as a summary judgment motion.

on the disposition of those claims, the Court may consider extending jurisdiction over the state law claim brought under the Florida Religious Freedom Restoration Act (FRFRA).

■■■ Plaintiff has been released from incarceration and is now living in Hickory, North Carolina. Doc. 218. "The exercise of judicial power under Art. III of the Constitution depends on the existence of a case or controversy." *Preiser v. Newkirk*, 422 U.S. 395, 401, 95 S.Ct. 2330, 2334, 45 L.Ed.2d 272 (1975). When there is no present case or controversy, a party lacks standing. "[P]ast exposure to illegal conduct does not in itself show a present case or controversy regarding injunctive relief . . . if unaccompanied by any continuing, present adverse effects." *O'Shea v. Littleton*, 414 U.S. 488, 495–496, 94 S.Ct. 669, 38 L.Ed.2d 674 (1974); *Wahl v. McIver*, 773 F.2d 1169, 1173 (11th Cir.1985); *Zatler v. Wainwright*, 802 F.2d 397, 399 (11th Cir. 1986). Plaintiff's release from prison and his residence in North Carolina render Plaintiff's equitable claims (declaratory and injunctive relief) moot. This case continues only as to Plaintiff's request for monetary damages.

■■■ Plaintiff requested both compensatory and punitive damages as relief. Doc. 27. However, there are no allegations of physical injury or harm to Plaintiff and, without physical injury, Plaintiff's request for monetary damages must necessarily be limited to nominal damages by virtue of 42 U.S.C. § 1997e(e). *Harris v. Garner*, 216 F.3d 970 (11th Cir.2000)[2], *reinstating in part* 190 F.3d 1279 (11th Cir.1999); *Osterback v. Ingram*, 263 F.3d 169 (11th Cir. 2001) (Table). Even though Plaintiff did not specifically request nominal damages, if he were successful in this case, nominal damages could still be recovered. *Memphis Community School District v. Stachura*, 477 U.S. 299, 308–309, 106 S.Ct. 2537, 2543–44, n. 11, 91 L.Ed.2d 249 (1986) (noting that nominal damages are an appropriate means of "vindicating" rights whose deprivation has not caused actual, provable injury). See, e.g., *Allah v. Al–Hafeez*, 226 F.3d 247, 251 (3d Cir.2000) (finding "it is not necessary to allege nominal damages."), *quoted in Mitchell v. Horn*, 318 F.3d 523, 533, n. 8 (3d Cir.2003); *Oliver v. Keller*, 289 F.3d 623, 629–630 (9th Cir.2002) (applying § 1997e(e) and permitted appellant to seek nominal damages even though they were not expressly requested); *cf. Davis v. District of Columbia*, 158 F.3d 1342, 1349 (D.C.Cir.1998) (declining to construe complaint as seeking nominal damages). In keeping with the principle that *pro se* complaints be construed liberally, *Haines v. Kerner*, 404 U.S. 519, 520, 92 S.Ct. 594, 30 L.Ed.2d 652 (1972), Plaintiff's amended complaint is read as having requested nominal damages.

## II. Allegations of the amended complaint

Plaintiff has alleged that he was denied his First Amendment right to the free exercise of his religion which is Native American. Doc. 27. Plaintiff asserts that he was denied a variety of items and activities which were required tenets of his religious faith. Among those things allegedly denied were: (1) designated holy ground, (2) smudging, (3) use of prayer pipe, (4) a sweat lodge, (5) use of sacred drum and rattles, (6) growing his hair long,[3] (7) wear-

---

2. *Harris v. Garner*, 190 F.3d 1279 (11th Cir. 1999) was vacated by 197 F.3d 1059, and the Opinion Reinstated in Part on Rehearing by 216 F.3d 970 (11th Cir.2000), *cert. denied* 532 U.S. 1065, 121 S.Ct. 2214, 150 L.Ed.2d 208 (2001). The parts of the panel opinion relevant to this legal issue were reinstated.

3. As noted *supra*, this claim is precluded by well established Eleventh Circuit law and must be dismissed. Doc. 207, p. 19.

ing of head bands, necklaces, and dream catchers, and (8) the closing of the hobby craft shop. Plaintiff complained that there have been only two pipe ceremonies and, at the second one, the Native American Spiritual Advisor did not smoke the sacred pipe. He alleges that the Department of Corrections was hindering efforts to bring in Native American volunteers.

Plaintiff also alleged an Equal Protection claim because the Florida Department of Corrections placed certain restrictions on Native American religion followers that were not placed on other religious groups. Doc. 27. One such example was that the Department required proof of ancestry before an inmate could participate. *Id.* Another example was the fact that Native Americans could wear headbands only during religious services, but Jewish and Muslim inmates were allowed to wear their religious headgear at any time. *Id.*

Plaintiff brought the above claims pursuant to 42 U.S.C. § 1983. *Id.* Plaintiff also alleged a conspiracy under § 1985(2) to deprive him of his First and Fourteenth Amendment rights and an additional conspiracy claim under 42 U.S.C. § 1986.[4] Finally, Plaintiff asserts a state law claim concerning violations of the Florida Religious Freedom Restoration Act. *Id.*

## III. Standard of Review

On a motion for summary judgment, a defendant initially has the burden to demonstrate an absence of evidence to support the nonmoving party's case. *Celotex Corporation v. Catrett*, 477 U.S. 317, 322–23, 106 S.Ct. 2548, 2553–54, 91 L.Ed.2d 265 (1986). If accomplished, the burden shifts to Plaintiff to come forward with evidentiary material demonstrating a genuine issue of fact for trial. *Id.* Plaintiff must show more than the existence of a "meta-

physical doubt" regarding the material facts, *Matsushita Electric Industrial Co., Ltd. v. Zenith Radio Corporation*, 475 U.S. 574, 586, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986), and a "scintilla" of evidence is insufficient. There must be such evidence that a jury could reasonably return a verdict for the party bearing the burden of proof. *Anderson v. Liberty Lobby*, 477 U.S. 242, 251, 106 S.Ct. 2505, 2512, 91 L.Ed.2d 202 (1986). However, "the evidence and inferences drawn from the evidence are viewed in the light most favorable to the nonmoving party, and all reasonable doubts are resolved in his favor." *WSB–TV v. Lee*, 842 F.2d 1266, 1270 (11th Cir.1988).

"Rule 56(e) … requires the nonmoving party to go beyond the pleadings and by [his] own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.' " *Owen v. Wille*, 117 F.3d 1235, 1236 (11th Cir.1997), *cert. denied* 522 U.S. 1126, 118 S.Ct. 1074, 140 L.Ed.2d 133 (1998), *quoting Celotex*, 477 U.S. at 324, 106 S.Ct. at 2553 (quoting Fed.R.Civ.P. 56(c), (e)). The nonmoving party need not produce evidence in a form that would be admissible as Rule 56(e) permits opposition to a summary judgment motion by any of the kinds of evidentiary materials listed in Rule 56(c). *Owen v. Wille*, 117 F.3d at 1236; *Celotex*, 477 U.S. at 324, 106 S.Ct. at 2553.

Local Rule 56.1(A) provides that a motion for summary judgment "shall be accompanied by a separate, short and concise statement of the material facts as to which the moving party contends there is no genuine issue to be tried. Failure to submit such a statement constitutes grounds for denial of the motion." The

---

**4.** Section 1986 conspiracy claims are "derivative of § 1985 violations." *Park v. City of* *Atlanta*, 120 F.3d 1157, 1160 (11th Cir.1997).

Local Rule also provides that the party opposing a summary judgment motion shall "file and serve a separate, short and concise statement of the material facts as to which it is contended that there exists a genuine issue to be tried ...." N.D. Fla. Loc. R. 56.1(A). "All material facts set forth in the statement required to be served by the moving party will be deemed to be admitted unless controverted by the statement required to be filed and served by the opposing party." *Id.* Here, Defendants filed a statement of material facts as to which they contend there are no genuine issues for trial. Doc. 33, p. 4, *et. seq.* Plaintiff's response to the summary judgment motion, doc. 141, is in the format of a memorandum of law and does not contain a separate statement of the material facts as to which he contends there is a genuine issue for trial. Nevertheless, it is apparent from his submissions in opposition to the summary judgment motion that Plaintiff contends there are genuine disputes of material fact, and his failure to comply with this technical requirement should be overlooked.

## IV. Relevant Evidence

While Plaintiff has raised specific challenges to the denial of certain religious practices, there is also a general claim about the lack of worship opportunities for Native Americans. Doc. 27, p. 7–C. Plaintiff has provided evidence that for Native Americans, "ceremonies [ ] are the primary vehicles of religious expression." Doc. 215, attachment (hereinafter, "Kim Foltz affidavit"). Native American spirituality "is a total way of life practiced twenty-four (24) hours of every day." *Id.*

The parties have submitted evidence concerning the evolution of the Native American religious program within the Florida Department of Corrections. Docs. 85 and 141, ex. H.

Liberty Correctional Institution was selected as a pilot facility for the Native American Religious Program. There were some inmates who were sent to Liberty Correctional Institution due to the failure of the pilot program at Lake Correctional Institution. However, the program at Liberty was experiencing the same kind of problems as Lake had been experiencing. The chaplains were having problems in trying to find and keep volunteers.

Doc. 141, ex. H, p. 28. Defendants aver that many attempts were made to obtain volunteers to conduct Native American services and ceremonies, and Defendant Mears's affidavit states that those efforts began in 1995.[5] Doc. 85, ex. A. A Native American Pilot Project actually began "in the Spring of 1996" at Liberty Correctional Institution when three inmates "expressed a desire to practice the native beliefs." Doc. 85, ex. B. Defendant Boyd was able to obtain a Native American Religion Advisor who was to "come to the Institution every other week to conduct religious ceremonies with those Native American inmates meeting the criteria of ethnicity established by the Department of Corrections with input from the Native American Society." Doc. 85, ex. B. "However, for whatever reason, this individual only came about six times." *Id.*

Thereafter, Assistant Superintendent of Programs, Mr. James K. Peacock, began "getting the Native Americans together once a week, if possible, to share a cultural exchange and interaction" which was referred to as a "Native American Support

---

**5.** Plaintiff did not specify a relevant time period in the amended complaint, but his challenge is certainly to the conditions existing at the time this lawsuit was filed in 1998. Docs. 1, 27. Plaintiff entered the custody of the Department of Corrections on August 18, 1995, and his race is listed as American Indian. Doc. 141, exhibit H.

Group." Doc. 85, ex. B. They began meeting "not as a religious group, but rather" as a support group. *Id.* Of the approximately fifteen inmates who participated in this group, five "were certified as Native Americans." Doc. 141, exhibit H, Watson affidavit.

Another religious advisor was eventually obtained and his first visit was on "June 19th." [6] Doc. 85, ex. B. Because the "Native American inmates were really turned off by [the] demeanor and approach" of that volunteer, Mr. Peacock concluded that the "individual was neither what they were looking for nor what they needed." *Id.*

On July 9, 1997, Mr. Peacock wrote letters to Sheridan Murphy of the American Indian Movement of Florida and Ruby Beaulieu of Keepers of the Circle, Inc., seeking assistance in finding a "Religious Leader" for Native American inmates within Liberty Correctional Institution. Doc. 85, ex. B. Mr. Peacock's letter explained that the inmates needed "someone to conduct pipe ceremonies, advise them on individual prayer techniques, etc." and that DOC rules prohibited an inmate from acting in that capacity. *Id.* Mr. Peacock stated that there was "no one on staff with the expertise to conduct Native American religious services" and that what they needed were "legitimate Native American Religious Leaders" to help the inmates rather than litigation. *Id.*

Plaintiff has presented a memorandum issued on December 17, 1997, which was written by Mr. Peacock to Defendant (Superintendent) Charles Mask. Doc. 141, ex. C. The memorandum's subject matter is "Native American Concerns" and states that a committee met on December 11, 1997, to address issues presented by two Native American inmates, Terry Childers and Paul Votta. *Id.* They proposed the establishment of "an inmate council, which would parallel Native American Councils in the Native American Culture on the outside." *Id.* The memorandum states:

> The committee saw this as no problem, since we already have AA, which is set up somewhat similar. We also already have in place a Native American Support Group with an administrative sponsor. It would only be a matter of changing the name, allowing them to elect the Council Position members and refining the structure and By–Laws.

Doc. 141, ex. C. It appears from Plaintiff's additional exhibits that the proposal was not implemented. Doc. 141, ex. H.

In early January, 1998, Chief Red Eagle of the Creek Confederation offered to assist Liberty C.I.'s Native American program, but his offer had to be delayed due to health problems. Doc. 85, ex. A. Furthermore, Chief Red Eagle could not "provide Traditional Native American religious services since he" had become "a practicing Baptist." *Id.* There is evidence, however, that on January 15, 1998, "Debbie Pierce of the Yellow Hair Clan conducted a Native American ceremony at Liberty Cl." *Id.*

On January 29, 1998, Defendant Mears contacted Vernon Linton of the Seminole Tribe in an effort to obtain a spiritual leader. *Id.* Mr. Linton was to "speak to the area Chief and the Council of the Seminole Tribe." Doc. 85, ex. A. On February 2, 1998, Defendant Mears contacted Messrs. Dave Marcomey[7] and Bobby Billy of the Native American Movement of Florida. *Id.* Mr. Billy said he

---

**6.** It is unclear whether this was in 1996 or 1997. Doc. 85, ex. B.

**7.** There are several places where this surname is alternately spelled Marcomey and Marco-

my. *See, e.g.,* doc. 85, ex. C. This report and recommendation will consistently identify this person as Marcomey.

"would consider" coming to Liberty C.I. on a "monthly basis." *Id.* On February 22, 1998, Defendant Mears again spoke with Mr. Marcomey about obtaining a spiritual leader. *Id.* Mr. Marcomey indicated he might "have some available volunteers but the key matter would be the ethnicity of the participants." *Id.* Mr. Marcomey wanted "to limit attendance to only those who [could] prove their ethnicity." *Id.*

On that same day, February 22, 1998, Defendant Mears and Chaplain David Pipping issued a memorandum to Mr. Peacok advising that Chaplain Pipping had spoken with Mr. Marcomey about the need for a Native American spiritual leader. Doc. 85, ex. C. That memorandum demonstrates that at that point in time, there was "no program for the Native Americans of any sort, religious or cultural." *Id.* The document further reveals that Chaplain Pipping agreed to "limit the attendance to those who [could] prove ethnicity if they desired." *Id.* Chaplain Pipping stated that they wanted to do so, "said they would help to establish ethnicity if necessary" and noted that "Mr. Marcomey said there [was] a Federal Law which back[ed] up ethnicity demands." *Id.*[8] The memorandum advised that Mr. Marcomey indicated he could arrange for "some spiritual services" on a "fairly regular basis" to meet the needs of the Native American inmates. Doc. 85, ex. C. Finally, Chaplain Pipping stated that if Mr. Marcomey could secure a volunteer on short notice, the first meeting could possibly be scheduled within a week. *Id.*

There is no evidence about what transpired after those communications, but the arrangement apparently fell through as another letter was written by Defendant Mears on March 6, 1998, to Mr. Billy Whitefox, "stressing" the Institution's "need for volunteers." Doc. 85, ex. A; ex. D. The letter indicates that Defendant Mears had already spoken with Mr. Whitefox on the telephone and the letter was a followup to their conversation. Doc. 85, ex. D. The letter expressed the "great need" for volunteers and stated that it was "against the rules for the inmates to lead the services or conduct services without a Citizen Volunteer." *Id.*

On the following day, March 7, 1998, Defendant Mears also wrote a followup letter to Mr. Marcomey expressing eagerness "to have a spiritual leader come as a faith representative for [the] Native Americans." Doc. 85, ex. E; *see also* ex. A. Defendant Mears, in writing for Chaplain Pipping, again fully agreed that they would "work with those who [could] prove ethnicity" so that Mr. Marcomey could be "assured that the volunteers [would] be dealing with true Native Americans." Doc. 85, ex. E. The letter states that the proof of ethnicity requirement was "entirely in line with [ ] instructions from the Central Office." *Id.* Finally, the letter reveals that two unsuccessful phone calls were made to Mr. Marcomey's home in an effort to secure a faith representative, and he again stressed that they wanted to begin services "as soon as possible." *Id.*

There is nothing in the record revealing what took place between early March and June, but Defendants presented evidence that on June 10, 1998, the American Indian Movement of Florida recommended Two Crow Allard as a volunteer for the Native American program. Doc. 85, ex. A; ex. F. The American Indian Movement of Florida sponsored "programs performed by **Red Earth Medicine Society.**" Doc. 85, ex. F (emphasis in original). Mr. Allard "conducted a scheduled program" on July 18th, but he "refused to smoke the ceremonial pipe with those he considered

---

8. The memorandum again reiterated, "[t]he key is the matter of ethnicity so far as they are concerned and that is also what Central Office agrees to." Doc 85, ex. C.

non-Native American." Doc. 85, ex. A. Chaplain Ring testified in his affidavit that Mr. Allard "said that smoking of the pipe was restricted to the Native Americans." Doc. 85, ex. K. Chaplain Ring reported:

He [Mr. Allard] said that it would not be proper and would degrade the pipe smoking ceremony to smoke the pipe with non-Native Americans. He said that several of the offenders who were present in the meeting were not truly Native Americans. He said that he could not smoke the pipe because of the participation of the non-Native American offenders being present in the meeting.

Doc. 85, ex. K. Nevertheless, Mr. Allard agreed to return for another service. *Id.* A Native American program was scheduled for August 8, 1998, but had to be "cancelled due to a death" in Mr. Allard's family. Doc. 85, ex. A.

In late August, Plaintiff sent an inmate request form to Defendant Mears asking why Mr. Allard would not be returning to the prison to conduct services. Doc. 141, ex. E. Defendant Mears advised Plaintiff that choosing or rejecting volunteers did not concern Plaintiff. *Id.* In that same request form, Plaintiff also asked "why Hebrew Isrealites and Muslims can meet once per week without a sponsor present, and Native Americans cannot meet in the chapel just as they do." *Id.* The response from Defendant Mears states: "The Hebrew Israelites meet to study in the library. The library is open to *all* inmates, including Native Americans. Muslim [sic] took their cause to court." *Id.*

Additional efforts were made to secure other volunteers and, apparently, Mr. Wayne Johnson agreed to act in that capacity. *See* doc. 85, ex. A. In Defendant Mears' response to Plaintiff's inmate request dated September 2, 1998, Defendant Mears stated that Wayne Johnson would be at the institution on September 26 at 1:00 p.m. for a service. Doc. 141, ex. E. Unfortunately, that program had to be cancelled "because the volunteer, Wayne Johnson, suffered a heart attack." Doc. 85, ex. A.

On October 8, 1998, Defendant Mears wrote a letter to Defendant Boyd and stated that earlier that day he had spoken with Dr. Rick Knight, a Native American Cultural Leader, about finding "a pipe-carrier to participate in" the Institution's Native American program. Doc. 85, ex. A; *see also* doc. 85, ex. J. Defendant Mears reported that "Dr. Knight and his associates [had] not found anyone who [was] willing to come." Doc. 85, ex. J. Defendant Mears spoke with Dr. Knight again on October 15th and he reported that he still had been unable "to secure a volunteer." Doc. 85, ex. A. The October 8th letter from Defendant Mears reveals that he, Dr. Knight, and Defendant Boyd were still "actively seeking a pipe-carrier." Doc. 85, ex. J. Defendant Mears had scheduled a "Native American program" for October 10th but the "volunteer, David Nez, decided he needed to spend more time with his family." Doc. 85, ex. A; *see also* doc. 85, ex. J.

Plaintiff presented as evidence a photocopy of a letter written to inmate David Croft from Sheridan Murphy, the State Executive Director or the American Indian Movement of Florida. Doc. 141, ex. D. That letter, dated October 23, 1998, includes the following statement:

For your information Florida AIM works with traditional Seminole spiritual man Bobby C. Billie and several others and has made this information of their availability known to the Florida DOC. At this time North Florida Regional AIM Director David Narcomey and Harold Locke have received no response from DOC in regards to their offer to bring Bobby C. Billie to any DOC facility in Florida.

Doc. 141, ex. D. Plaintiff also presented a letter addressed to himself from Dr. Rick Knight. Doc. 141, exhibit I. Dr. Knight states in his letter that he had ...

... endeavored to find a pipe carrier to visit the brothers throughout the State of Florida with no success. Although Florida has a fair size population of Native People very few are traditional. To the best of my understanding many profess Christianity or have become urbanized people.

Doc. 141, ex. I. The letter goes on to state: "With so few traditional people within the state it has been difficult to find someone willing to volunteer." *Id.* Finally, the letter indicates that the Department's new (August 25, 1999) guidelines (which make it possible for any inmate to designate Native American spirituality as his religious preference) would "make it even harder to find a traditional pipe carrier willing to visit Florida institutions." *Id.*

There is evidence that a number of books and videotapes concerning the Native American religion are kept in the chapel and are available to inmates. Doc. 85, ex. R; *cf.* doc. 141, ex. H (marked by Plaintiff as ex. BK). Medicine bags are also permitted and may be worn by Native American inmates at all times. *See* doc. 85, ex. M. Because a medicine bag is sacred, "[o]nly the inmate may remove and handle the medicine bag's contents unless an item is determined to be contraband or [a] security risk."[9] Doc. 85, p. 17.

Additional evidence presented by Plaintiff is a grievance filed by Inmate Croft in June of 1998 requesting many of the items at issue in this case, (prayer pipe and tobacco, prayer circle, holy ground, feathers, materials for smudging, a sweat lodge, growing long hair, and a drum and rattle). Doc. 85, ex. G. Defendant Mears responded to the grievance and said, "All the items you listed are not permitted in the compound, but must be kept in the Chapel." *Id.* Defendants assert in the summary judgment motion that this response, while admittedly denying " 'possession' of the requested items," still "did not preclude the use of the items during religious services." Doc. 85, p. 6. Inmate Croft's subsequent formal grievance requesting those items and also a headband, were denied by Mr. Peacock. Doc. 85, ex. H. That response states that the Department's "Guidelines for Native American Religious Observances," published "on February 28, 1996, does not allow for the items and practices [ ] requested." *Id.* Mr. Peacock stated that the policy "only allows for the Sacred Pipe Ceremony to be conducted by a Native American spiritual leader." *Id.* Mr. Peacock also advised that the policy allows "for the wearing of a medicine bag, which must come from an authorized Native American Volunteer." *Id.* Finally, the response on inmate Croft's appeal concerning the requested items said, in pertinent part:

The Department does allow Native American inmates the use of a pipe during the Sacred Pipe Ceremony conducted by a qualified Native American spiritual advisor. Native American [inmates] may also possess a medicine bag. Other items requested are not permitted by the Department and the Department does not have sweat lodges.

Doc. 85, ex. I.

A second general claim evident from Plaintiff's allegations is the denial of equal

---

9. Attached to the amended complaint is a 1998 memorandum from Defendant Mears explaining that staff members "must not touch" an inmate's medicine bag "unless a legitmate [sic] security violation is established." Doc. 27, attachment. If the bag is touched by staff, "the bag no longer can be used by the Native American Inmate and he will get another one." *Id.*

protection. Plaintiff has complained of discriminatory treatment in several respects, requiring proof of ancestry, inability to wear headbands at all times, and lack of worship opportunities as other faiths are permitted to meet weekly and without an outside volunteer. Plaintiff has presented an affidavit of Muslim inmate Siddiq Asad who states that he attends a Ju'Mah prayer every Friday in the chapel at Hamilton Correctional Institution. Doc. 141, ex. B. That affidavit also establishes that there is not an outside representative who comes in to lead services "and that Muslim prisoners, such as [himself], lead said services every Friday." *Id.* The inmates are permitted to "pick the content of the Khutbah (Friday sermon) every Friday." *Id.* Further, the affidavit explains that the "prison chaplain is in the building at the time, but does not supervise [the Muslim] services." *Id.* Another affidavit by Jewish inmate Maxwell Gottesman likewise demonstrates that Jewish services are held weekly, "with no supervision," and that "an inmate leads the service while the chaplain or an officer remains outside the room." *Id.*

Plaintiff presented evidence that as of March 10, 1998, both the "Native American Religious Program and Support Group" were terminated. Doc. 141, ex. E. Plaintiff complained to Chaplain Pipping that Native Americans were left with "no meaningful way(s) to exercise [their] Religious traditions." *Id.* Plaintiff asked if Chaplin Pipping knew whether the programs would "ever be re-instated, or if there [was] an alternative to [their] needs to Religious expression." *Id.* The response on that inmate request [10] states:

> First of all we must establish [ethnicity] for determination of Native American status per the Central Office mandate. That is a case by case need. You need

to be in compliance with Ethnicity, i.e., be assigned a number from the Bureau of Indian Affairs, or be a member of a recognized U.S. Indian community ....
> I have made four contacts with Native American leaders via phone & letter so as to begin actual spiritual service for Native Americans. I have been told they will come here soon. No date has been given.

Doc. 141, ex. E.

Plaintiff presented another inmate request form, dated July 26, 1998, from inmate Louis Santiago who expressed his sincere desire to learn and practice Native American spirituality and asked why he could not participate without proof of ancestry. Doc. 141, ex. E. The response, also from Chaplain David Pipping, states that it is a statewide policy of the Department of Corrections and that there was "*no* option at" the institutional level. *Id.* Furthermore, the second part of inmate Santiago's response asked why the Native Americans could not meet together to study or could the Support Group again be formed. *Id.* The response was: "You were told by the Rep. Chap. Supervisor, Mr. Ring, that there will be no such thing as a support group. That is not part of the N.A. faith. Again, we are under strict guidelines. The Central Office is in absolute control of this matter." *Id.*

The guidelines issued by the Department of Corrections on August 10, 1995, included the following statements: "The requirement for inmate participation in Native American religious observances is Native American ethnicity. Even when a different religious preference is stated, ethnic origin is the determining factor." Doc. 141, ex. G. "It is suggested that an inmate must be a member of a federally

---

**10.** It appears from that exhibit that Plaintiff actually directed his request to Mr. Hosford, who then wrote on the form that it was referred to Defendant Mears. The response, however, is signed by Chaplain Pipping. Doc. 141, ex. E.

recognized Indian tribe to be identified by the Department of Corrections as a Native American or Indian qualified to participate in Native American religious observances." *Id.* Additionally, the guidelines provided:

> Although F.A.C. 33–3.014(3)(c) prohibits restriction of attendance or participation in religious activities based on race, color, nationality or creed, it is suggested that the special legal status of Indians under federal law makes a program based on ethnicity both lawful and appropriate. To establish status as a Native American, the inmate must provide a valid Bureau of Indian Affairs (BIA) or tribe number or have his membership in a recognized tribe confirmed in writing by the tribe.

Doc. 141, ex. G. The 1995 guidelines also state that representatives of the Seminole, Miccosukee, and other Indian tribes were "consulted in the development of" the guidelines and recommendations. *Id.* Pursuant to a new policy issued by Department of Corrections Secretary Michael Moore on August 25, 1999, inmates "may designate the Native American religion" as their "religious preference, regardless of race or ethnic background." Doc. 85, ex. M.

There is also evidence that on January 12, 2000, when Plaintiff requested a list of persons who could send him a medicine bag, Plaintiff was told by Chaplain Heath that he had to identify his tribe. Doc. 141, ex. I. Similarly, Plaintiff presented an inmate request from Christian Brotons, dated January 5, 2000, in which he was told by Chaplain Haskel that [C]haplaincy Services in Tallahassee would be sending a list of Tribal Authorities, but "[i]t would help to know your Tribal affiliation." *Id.* That inmate, Christian Brotons, also submitted an affidavit attached to the inmate request form that asserts he is denied the right to practice his Native American religious tradition, that Muslim and Jewish inmates can receive "any kind of religious items," but Native Americans "must have an authorized practitioner to send" theirs. *Id.* An additional affidavit attached to the first affidavit also reiterates that while Muslim and Jewish inmates can have religious materials sent from any religious vender or merchant, Native American inmates must have them sent from an authorized source. *Id.* Moreover, the one authorized source at Hamilton Correctional Institution will no longer provide medicine bags to inmates due to a disagreement with a Department of Corrections regulation. *Id.* Accordingly, inmate Brotons complains that he is effectively denied a medicine bag which, by regulation, he is permitted to receive. *Id.* Defendants evidence similarly reflects that medicine bags "must come from an authorized Native American Volunteer." Doc. 85, ex. H.

Plaintiff has presented as additional evidence a photocopy of a page from the Florida Department of Corrections' 1997–1998 Annual Report. Doc. 141, ex. 1–6. That document indicates a legislative appropriation of "over $1.6 million for faith-based programs ...." *Id.* In an inmate request dated January 3, 2000, Plaintiff asked for information on the Department's sponsorship of faith-based programs, and specifically mentioned a " 'God Pod' at Tomoka Correctional Institution." Doc. 141, ex. F. A letter response was sent to Plaintiff explaining that the program at Tomoka C.I. had "a residential component as part of the program" which was designed "to improve the overall effectiveness of the instruction provided through the didactic sessions." *Id.* While acknowledging that there was "normal provision for inmate housing, clothing, food, medical, vocational and education programs," the letter states the program was not funded through the Department of Corrections' budget but with "separate grant money" from "numerous community citizens that volunteer their time and energies to assist

the program effort." *Id.* The letter advised that "[n]o faith group [was] excluded from making a similar proposal to provide an in-prison faith-based residential program." *Id.* Finally, the letter stated that "the department [did] not supply the program personnel, or the community coordinators, or the curriculum." *Id.*

Plaintiff also presented additional evidence[11] concerning the Department's opening of the "God Pod" at Tomoka Correctional Institution. Doc. 141, ex. A–1. The "God Pod" was described as a pilot program bringing 64 inmates together who would live in a segregated dormitory, but continue to work and eat meals with the general prison population. *Id.* They must adhere to a stricter code of conduct and their "spare time will be devoted to Bible studies, prayer and introspection." *Id.* Another article described Tomoka's faith-based program, officially named "Horizon," as a partnership between the Department of Corrections and Kairon Prison Ministry, the Foundation for Partnerships in Correctional Excellence, and the Commission on responsible Fatherhood/Ounce of Prevention Fund of Florida. Doc. 141, ex. AT–1. The one-year program included "Christ-based teachings" and all of the men "live[d] in an open dormitory setting with four people to a pod." *Id.*

Defendants have presented as evidence that it is their written policy which is to prohibit "discrimination for or against any inmate based on his religious beliefs or practices, but . . . religious beliefs do not justify violation of Department or institutional rules and regulations." Doc. 85, ex. P. Another policy is "to extend to all inmates the greatest amount of freedom and opportunity for pursuing individual religious beliefs and practices consistent with the security and good order of the institution." Doc. 85, p. 17, *citing* FLA. ADMIN. CODE R. 33–3.014(2); doc. 85, ex. P. The Department asserts that it seeks to provide "inmates with an equal opportunity to express their religious beliefs" and "engage in religious practices so long as the practice does not compromise security and order in the institutions." Doc. 85, p. 18.

In support of his conspiracy claim, Plaintiff has submitted an inmate request in which he asked Mr. Peacock for an affidavit or "General Statement" concerning "the Pilot Program for Native Americans at Liberty C.I." Doc. 141, ex. I. In his response Mr. Peacock states:

> I have personally sufferred [sic] tremendously for my involvement in the Native American Pilot Program at Liberty C.I. Based on this, I will not provide an affidavit for fear of further repercussions. However, if subpoenaed before the court, I would tell the truth as I always have. Incidently, you're filing against only some of the people that put a stop to the program and were responsible for my being removed. There are two others that played a much greater role than those you've mentioned.

*Id.*[12] Plaintiff also points to statements made by persons interviewed for the inter-

---

**11.** No objection has been raised by Defendants to the newspaper articles offered as evidence by Plaintiff. In some instances, such evidence *may* be considered at the summary judgment stage. It is likely that the facts recounted in the articles could be proven with admissible evidence at trial. *McMillian v. Johnson,* 88 F.3d 1573, 1584 (11th Cir. 1996), *aff'd McMillian v. Monroe County, Ala.,* 520 U.S. 781, 117 S.Ct. 1734, 138 L.Ed.2d 1 (1997), *citing Church of Scientology Flag Ser-*

*vice Organization, Inc. v. City of Clearwater,* 2 F.3d 1514, 1530–31 (11th Cir.1993), *cert. denied* 513 U.S. 807, 115 S.Ct. 54, 130 L.Ed.2d 13 (1994).

**12.** Plaintiff suggests in his memorandum that the other persons mentioned by Mr. Peacock are Chaplain Whitley Ring and Assistant Warden Russell Smith. Doc. 213, p. 5. Those two individuals, however, are not named Defendants in this case.

nal Department of Corrections investigation (# 98–10488) as additional evidence of the conspiracy. *See* doc. 213, pp. 5–11; *see generally* doc. 141, ex. H. Plaintiff contends that statements made during the investigation reveal a conspiracy between Defendants Boyd, Mask, and Mears, all of whom are officials within the Florida Department of Corrections. Doc. 213, p. 9, *see* doc. 141, ex. H.

The remainder of the Rule 56 evidence will be discussed claim by claim.

### Holy Ground

Plaintiff requested the designation of "Holy Ground" and claims that "Holy Ground" is a required tenet of Native American beliefs in that, without it, no ceremonies, prayers, or anything else are possible. Doc. 27. The request was denied on the basis that allowing "a specific group to restrict attendance or participation in a religious service or activity in a specialized area of the compound not accessible by other offenders" would "create discord throughout the excluded inmate population." Doc. 85, ex. L. The Department also expressed concern that such action would "encourage other groups to demand that a 'special' area within the compound be designated for their religious activities only." *Id.* Furthermore, creating a restricted area would require monitoring and supervision to prevent unauthorized persons from entering the area." *Id.* Such a task cannot be accomplish by inmates as they may not act to prevent other inmates from entering, and chaplains should not be placed in such a position where "verbal confrontations and possible physical altercations [ ] could occur." *Id.* Thus, security staff would "be required to supervise" the area which would take "staff away from their regular assigned duties, which would like-ly cause a lack of supervision in other areas." *Id.* Defendants also assert that creation of "holy ground" would "require the Chaplain to be available to supervise the activity each time the area was used." *Id.*

Defendant Mask had, at one time, gave "approval for the construction of a fenced in area behind the Chapel to be designated as 'holy ground.'" Doc. 141, ex. H. However, his approval was "wrong" as he had not obtained "authorization from the Region Office to construct" the fenced area. *Id.* Plaintiff presented evidence that assistant superintendent Peacock sought permission to have a Holy Man bless the ground, but there is no evidence that such an event ever took place.

### Sweat Lodge

Plaintiff asserts that a sweat lodge is required "to remove all negative influences through the heat and sweat," and allows a person "to re-connect with Earth, Air, Fire, Water, and all other living things, and to emerge from Mother Earth re-born and cleansed completely to continue our Earth walk." Doc. 27, p. 7–A.

> Comparable to the Sacred Pipe the Sweat Lodge is a fundamental cornerstone of the spiritual teachings for many Indian tribes. It is a purification ceremony that allows for communal prayer or personal healing. Everything about the Sweat Lodge is ceremonial and sacred, from the construction of the Lodge and the fire to the disposal of the ashes.

Kim Foltz affidavit.

It is not disputed that Defendants did not allow construction and use of a sweat lodge.[13] The reasons presented by Defendants for this denial are much the same as the reasoning given for denial of setting aside a holy ground: constructing such a

---

**13.** A sweat lodge is "constructed of specific materials: willow-branches lashed together with twine, cloth, or bark and covered with tarpaulins, blankets, or canvas." Doc. 85, ex. L.

place and then disallowing use and access to "the majority of the offender population" would "create problems for institutional staff by creating discord among the excluded offender population." Doc. 85, ex. L. Construction of a sweat lodge would also require construction of a separate storage area adjacent to the lodge to store "tools, tarps, firewood, and water buckets." *Id.* "A fire pit must also be constructed outside the lodge for the heating of the rocks." *Id.*

Moreover, because the sweat lodge and its storage area is "considered sacred," access of security staff would be restricted and unannounced or random "searches for contraband, without the presence of participating Native American offenders and the chaplain" would be eliminated. Doc. 85, ex. L. Security must rely on unannounced searches "to control the introduction and accumulation of contraband within the correctional facility." *Id.*

Plaintiff presented an affidavit of inmate Daniel P. Goliano who stated that when he was imprisoned in Colorado and California, they operated sweat lodges every week. Doc. 141, exhibit. In Colorado, they had a sweat lodge once a month, and in California, elders from outside the prison came "to sweat every week." *Id.* There is evidence also that a women's prison in Colorado permits sweat lodges and has "Sweats twice per month." Doc. 213, attachment. Plaintiff has also presented evidence that state prisons in Missouri permit "the building of sweat lodges" and allow a "Sweat Lodge ceremony." Doc. 213, attachment. However, that document also reveals that "Sweating can occur only after a Native American spiritual advisor has been secured" and that "there are few Native American spiritual advisors in" Missouri. *Id.*

**Smudging**

"Smudging is the burning of sage, cedar, and sweetgrass in a shell, using a feather, or feather fan, to direct the smoke over the body to purify it." Doc. 27, p. 7. This act of purification is required to enable a person to enter Holy Ground, touch the Pipe or other sacred item, and give power to prayer. *Id.*

The Department of Corrections issued new Guidelines for Native American Religious Observances on August 25, 1999. Doc. 85, ex. M. Those guidelines, identified as Policy # 503.001, permit "Native American inmates to participate in smudging during a supervised group meeting." Doc. 85, p. 10. Smudging is performed "by the Native American practitioner/volunteer smudging each participant into the circle." Doc. 85, ex. M. Smudging "is limited to the chapel or to an approved location on the compound under the supervision of the Chaplain and Native American volunteer." Doc. 85, ex. L; *see also* doc. 85, ex. M.

There is evidence of two security concerns with smudging. Doc. 85, ex. L. The first concern is to the safety of offenders and staff due to obvious problems with "open burning" on the grounds of an institution. *Id.* The second concern is that the smell of burning "herbs could mask the odor of narcotics or other items being burned." *Id.* The spiritual advisor must remove the items used for smudging at the conclusion of the ritual as there is limited storage space available in the chapel and for storing an inmate's personal property. *Id.*

**Prayer Pipe**

Smoking [14] the pipe "connects the person smoking to all of life, and the smoke of

---

**14.** "The smoke is considered to be the breath of prayer, and when the smoke is drawn through the pipe stem, the breath of the Great Spirit is taken into the body." Doc. 85, ex. M.

the sacred tobacco carries the prayers to the Great Spirit ...." Doc. 27, p. 7–A.[15] The sacred pipe, which "is the cornerstone of traditional Native American faith" and "is used for both private and group prayers" in the Native American religion, "is accorded a high degree of reverence ...." Kim Foltz affidavit, doc. 215. The pipe ceremony is allowed "no more than twice a month." Doc. 85, ex. M. The ceremony must be conducted by a Native American volunteer, only at designated outside locations "under the supervision of the Chaplain or the Native American practitioner/volunteer," and only "inmates who have designated their religious preference as Native American are authorized to participate in the pipe ceremony." Id. Non–Native American inmates may attend the ceremony, but "will not be permitted to participate in the pipe sharing." Id. Substances to be used in the pipe are inspected prior to being brought into a correctional facility and, after the ceremony, the volunteer must "place the pipe in its appropriate cover and remove all sacred items from the compound." Id. Inmates cannot keep a pipe or herbs in their cells as items of personal property because it could interfere with the control of contraband. Doc. 85, ex. L. The designation of an item as sacred means that security staff could not conduct routine searches making the pipe an "ideal place to hide contraband." Id.

Plaintiff submitted an inmate request form on November 16, 1999, and said that he was "in the process of arranging a Native American volunteer to come to Hamilton C.I. annex to conduct a Pipe Ceremony." Doc. 141, ex. C. Plaintiff asked where they could smoke the pipe and was told, "If you have a name of a volunteer who would like to assist in the Native American program, please submit their name. They must be a qualified volunteer." Id. On November 30, 1999, Plaintiff advised that the volunteer was "William Weatherford, known as Chief Red Eagle of the Creek Confederation in Atmore, Alabama." Id. Plaintiff then sent an inmate request on December 13, 1999, asking if contact had been made with Chief Red Eagle and, "when and if a pipe holder comes to perform a ceremony," where it would be performed since a new statute, FLA. STAT. § 944.115, prohibited smoking in any Department of Corrections building and Hamilton Correctional Institution had not designated any outside Holy Ground. Id. The response to Plaintiff's grievance states, "I have spoke [sic] with the Service Center Chaplain who is checking to see what volunteer might be available." Id.

**Sacred Drum and Rattles**

The drum represents "the heartbeat of Mother Earth and the rattles are used to attract and honor the spirits," as well as to accompany sacred songs. Doc. 27, p. 7–A. A drum is allowed and may be donated to the institution and for keeping in the chapel, but it cannot be personal property of an inmate. Doc. 85, exhibits L and M. Use of the drum outside of a "Native American group or circle meeting is prohibited." Doc. 85, ex. M. Policy 503.001 "authorizes the limited storage of a drum or piece of animal skin that may be donated directly to the institution." Doc. 85, ex. M. Although chapels "have limited storage space," drums may be stored in the chapel. Doc. 85, ex. L.

**Headbands**

Plaintiff claims that wearing headbands "must be allowed for spiritual expression"

---

**15.** Without repeating this for each item, it is noted Plaintiff has asserted that each item requested is a required tenet of his religion. Doc. 27. Defendants have not disputed this claim. Indeed, in this particular case, Policy 503.001 identifies "[t]he use of the Sacred Pipe" as "the utmost importance to spiritual observance." Doc. 85, ex. M.

just as inmates of other religions are permitted to have a Koofi [Kufi [16]] (Muslim), Yarmulke and Teffillin (Jewish), Rosary (Catholic), and Cross necklace (Christian). Doc. 27, p. 7–B. The headband is significant because "it completes and symbolizes the Sacred Circle of life." Kim Foltz affidavit. There is evidence that in 1998, Plaintiff's request to wear a headband was denied. Doc. 141, ex. E; *see also* doc. 141, ex. C.

After the issuance of Policy 503.001 in August of 1999, the Department allowed Native American inmates to wear headbands only during religious services. Doc. 85, ex. L; doc. 85, ex. M. The headband could be stored as part of the inmate's personal property and could be made of fabric or animal skin, of any color, no wider than one (1) inch, and "no longer than the circumference of the head, allowing no more than three (3) inches on each end from the knot." Doc. 85, ex. M.[17] Bandanas cannot serve as a headband.[18] *Id.* Concern over headbands derived from the growing problems of gangs and the possibility that offenders could use headbands "as a means of displaying their gang affiliation without the interference of staff." Doc. 85, ex. L.

Plaintiff submitted the affidavits of inmates Maxwell Gottesman and Maynard Eatherton, III, both of whom are of the Jewish faith. Doc. 141, ex. B. These inmates state that they are allowed to possess a yarmulke and wear it on the compound at anytime. *Id.* Other affidavits from Muslim inmates Siddiq Asad and Lynwood Taylor affirm that they are also permitted to have a kufi and to wear it all the time. *Id.*

Plaintiff sent an inmate request to Defendant Mears questioning why the same security interest that prevents Native Americans from wearing their hair long does not prevent Muslim or Nation of Islam practitioners from wearing the Kufi caps. Doc. 141, ex. E. Defendant Mears responded that Kufi caps were permitted and could "be searched by security at any time." *Id.*

**Hobby crafts**

Plaintiff desired a hobby craft shop so that he could "express [himself] through carvings, beadwork, leatherwork, pottery and other artwork." Doc. 27, p. 7–B. Plaintiff asserts that artwork "is a direct expression of spiritualness." *Id.* A craft hobby shop for the exclusive use of one group of inmates is no longer permitted [19] due to the appearance of preferential treatment and the resulting discord that could arise. Doc. 85, ex. L. Dissension on the grounds of a correctional institution creates "a hostile environment for staff and other offenders." *Id.* Additionally, allowing donated materials increases opportunities for the "introduction of contraband" and the tools to be used in a hobby craft shop could be "used in an escape or to do bodily harm to staff or inmates . . . ." *Id.* Such an area would require constant supervision, "placing an additional responsibility and increased work load on assigned staff." *Id.*

16. Although this word is spelled various ways in this file (koofi, kuffies, etc.), it is properly spelled kufi and will be done so consistently throughout this report and recommendation regardless of the spelling used by the parties.

17. If the color of a headband becomes a security threat, the inmate is allowed to exchange the headband for one of a different color. Doc. 85, ex. M.

18. Policy 503.001, established by Defendant Moore in 1999, now allows Plaintiff to have a headband. Doc. 85, ex. M.

19. A hobby craft shop used to be in existence at Liberty Correctional Institution. *See* doc. 27, p. 9–A; doc. 141, p. 11. The court judicially notes that almost every institution used to have craft shops for prisoners.

Plaintiff has provided evidence regarding the prior operation of a hobby craft program (shop) that operated at Liberty Correctional Institution. Doc. 141, ex. H. The evidence comes from an investigation[20] conducted by the Department of Corrections Office of the Inspector General. *Id.* That investigation revealed that, initially, one Native American inmate, Terry Childers, was requested to carve sculptures to put in a new display case that was constructed in the Administration Building at Taylor Correctional Institution. *Id.* Inmate Childers was allowed to carve a piece of cedar wood with a nail as the carving instrument, and began working in a corner of the property office. *Id.* "When the institution was relocating the property office, [inmate Childers] asked" if he could use part of the vocational electronic shop for crafts. *Id.* The request was granted and inmate Childers worked there under Mr. Register's supervision. *Id.* Eventually other inmates became involved and, sometime around April of May of 1997, assistant superintendent Peacock asked Mr. Register to "supervise the inmates assigned to the Native American Arts and Craft Shop." *Id.* Mr. Register admitted during the investigation that he did not supervise the inmates when they were using Class A tools. *Id.* Noteworthy from this investigation is that no official from the Chaplaincy Department authorized the program and, indeed, Chaplain David Pipping stated during the investigation that "it was a program that did not involve the Chaplaincy Department." *Id.* However, assistant superintendent Peacock believed the hobby craft program was "an expression of one's inner religious experience." *Id.*

As evidence concerning the presence of other dangerous tools, Plaintiff presented his own affidavit, doc. 141, ex. B, In which he states that while assigned to work the grounds of the institution, his 15–20 man squad has access to many class A tools such as rakes, hoes, shovels, and edgers. *Id.* The work squad of both medium and minimum custody inmates is spread over 100 to 150 yards with only one guard assigned to supervise. *Id.* The guard may be "as far as 100–150 yards away from [Plaintiff] and other inmates possessing class A tools." *Id.*

As additional evidence, Plaintiff presented an article indicating that an inmate named Francesco Zambutto learned carving with a chisel while at prison when he took a clay sculpturing class. Doc. 141, ex. 12–A. The article explained that inmate Zambutto, housed at Zephyrhills Correctional Institution, carved a 15–foot totem pole out of a decaying tree. *Id.* Plaintiff also submitted the affidavit of Jonathan Steele who testified that, while incarcerated at Sumter Correctional Institution, he observed an arts and craft shop that had "saws, chisels, and wood cutting tools." Doc. 141, ex. B. Inmate Steele said that "at least 30 to 40 inmates had access to the tools and shop that was located next to the gym area." *Id.*

---

**20.** The investigation was centered on the following allegations of misconduct: (1) Liberty C.I.'s administration allowed operation of an arts and crafts program for Native American inmates under the auspices of the Native American Religious Pilot Program; (2) Contraband articles were brought onto institution grounds for use in the arts and crafts program; (3) Contraband articles were removed from the institution by staff; (4) misuse of funds from the Inmate Welfare Fund for the Native American Cultural Program; (5) proper authorization was not given for either the construction or removal of a fenced area that was designated sacred ground; (6) that [Defendant] Chaplain Boyd knew of the arts and crafts program but failed to report it; and (7) inmates in the arts and crafts program were "monetarily compensated for creating Indian Artwork." Doc. 141, ex. H. The investigation found numerous violations in the way the program was conducted. *Id.*

## V. Analysis

It is undisputed that Plaintiff's Native American spiritual beliefs are of great importance to him. *See* doc. 141, exhibits. There is also no question that Plaintiff has significant constitutional rights concerning the exercise of his religious beliefs.

### Equal Protection

The court must give a generous construction to Plaintiff's complaint. Implicit within the amended complaint is an equal protection claim, though the claim is not made expressly. Doc. 27. Plaintiff asserts in that complaint that other faiths such as "Christian, Muslim, Jewish, Wiccan, Hebrew–Israelite, Catholic, and others [are allowed] to practice their beliefs and have their religious items." Doc. 27, at p. 7–F. Plaintiff alleged that Defendants do not allow Native American followers to practice their faith, have sacred items (except for a medicine bag), "place racial restrictions upon those who would follow the Native American path, restrictions placed upon no other Faith group." *Id.* In the "statement of claim" section of the complaint, Plaintiff stated that Defendants violated their First and Fourteenth Amendment rights "to practice their Native American beliefs, and by placing restrictions on those who would practice the Native American religion not placed on any other religion, by requiring proof of Native American ancestry to be allowed to follow the Native American beliefs." *Id.*, at 8. Plaintiff also claims, "[n]o other religion is discriminated against on a racial basis in Florida's prison system; nor denied so completely their religious Freedom." *Id.* In presenting his request for relief, Plaintiff sought injunctive relief which would allow Plaintiff practice his religion "as all other religions are allowed," and to wear "headbands and bone-choker necklaces to be worn at all times in the same manner

that Muslim, Jewish, and Christian prisoners are allowed to wear their religious headgear and/or necklaces ...." *Id.*, at 9–A. Finally, in stating his now abandoned § 241 claim, Plaintiff specifically stated that Defendants denied Plaintiff "the protected First Amendment right to freedom of religion, and the right to Due Process and equal protection of the law under the Fourteenth Amendment by applying unequal restrictions between those who would follow the Native American religion, and those who would follow other beliefs, discriminating against, and denying the Plaintiffs the right to practice their Native American beliefs, while accomodating [sic] all other religions." Doc. 27, p. 8–A.

Defendants did not address this claim in the motion for summary judgment. Consequently, Plaintiff's equal protection claims should proceed to trial.

### First Amendment claims

■ The First Amendment, made applicable to the States through the Fourteenth Amendment, "safeguards the free exercise of [one's] chosen form of religion." *Cantwell v. State of Connecticut,* 310 U.S. 296, 303, 60 S.Ct. 900, 903, 84 L.Ed. 1213 (1940). While prisoners retain First Amendment rights, including the First Amendment right of free exercise of religion, *see Cruz v. Beto,* 405 U.S. 319, 92 S.Ct. 1079, 31 L.Ed.2d 263 (1972) (*per curiam* ), prison regulations or policies "alleged to infringe constitutional rights are judged under a 'reasonableness' test less restrictive than that ordinarily applied to alleged infringements of fundamental constitutional rights." *O'Lone v. Estate of Shabazz,* 482 U.S. 342, 349, 107 S.Ct. 2400, 2404, 96 L.Ed.2d 282 (1987) (holding that the *Turner v. Safley* standard of review is applicable to claims that an inmate's free exercise rights have been violated).[21] *O'Lone* continued the Court's admonition

**21.** In *City of Boerne v. Flores,* 521 U.S. 507, 117 S.Ct. 2157, 138 L.Ed.2d 624 (1997), the Court held that the Religious Freedom Resto-

ration Act, (RFRA), 42 U.S.C. § 2000bb, *et seq.,* was unconstitutional as exceeding Con-

to give respect and deference to the judgment of prison administrators even in First Amendment challenges raised within the confines of prisons or jails. 482 U.S. at 350, 107 S.Ct. at 2405.

The *Turner* standard of review requires the Court to uphold prison regulations if they are "reasonably related to legitimate penological interests." *O'Lone,* 482 U.S. at 350, 107 S.Ct. 2400, *utilizing the standard of Turner v. Safley,* 482 U.S. 78, 107 S.Ct. 2254, 96 L.Ed.2d 64 (1987).[22] Thus, "[a] prison regulation, even though it infringes the inmate's constitutional rights, is an actionable constitutional violation only if the regulation is unreasonable." *Hakim v. Hicks,* 223 F.3d 1244, 1247 (11th Cir.2000), *cert. denied,* 532 U.S. 932, 121

S.Ct. 1382, 149 L.Ed.2d 307 (2001) (holding that the Department of Corrections policy to not permit a "dual-name" on inmate identification card violated inmate's right to the free exercise of religion by denying him his Muslim identity and was unreasonable under *Turner* ).

█ Prior to considering *Turner*'s requirements, the Court must determine whether there has been an infringement in the first place. The relevant question is whether one has been substantially burdened in his religious practice. *Cheffer v. Reno,* 55 F.3d 1517, 1522 (11th Cir.1995).[23] While there is hesitancy to apply a standard that considers whether one is absolutely required to take some action or whether something less would suffice,[24]

---

gress's authority under the Constitution. That decision required returning to the standard of review employed in *Employment Div., Dept. of Human Resources v. Smith,* 494 U.S. 872, 110 S.Ct. 1595, 108 L.Ed.2d 876 (1990), and in the context of prison cases, *O'Lone v. Shabazz, supra.*

**22.** In *O'Lone,* the Court concluded that

a prison rule preventing prisoners from attending a Muslim prayer service when they were working outside was adequately supported by specific concerns of prison administration. [citation omitted] In reaching this result, the Court in *O'Lone* did not doubt that the disputed rule impinged on the prisoners' constitutional rights. *Id.,* at 349–52, 107 S.Ct. at 2404–06. Rather, the Court held that 'the regulations alleged to infringe constitutional rights were reasonably related to legitimate penological objectives.'

*Id.,* at 353, 107 S.Ct. at 2407, *quoted in Levitan v. Ashcroft,* 281 F.3d 1313, 1318 (D.C.Cir. 2002).

**23.** The standard for determining whether, as an initial matter, a governmental policy or action violates one's right to the free exercise of his religion "must establish that the action substantially burdens" his ability to exercise his religious beliefs. The fact that the Religious Freedom Restoration Act eliminated application of the "least restrictive means" test but did not alter the standard for determining whether there was a constitutional violation

in the first place. *See Levitan v. Ashcroft,* 281 F.3d 1313 (D.C.Cir.2002); *Gill v. DeFrank,* 8 Fed.Appx. 35, 36, 2001 WL 388057, at *1 (2d Cir.2001)(holding that "missing one religious service does not constitute a substantial burden on an inmate's right to the free exercise of his religion.").

**24.** Perhaps the line demarcating when a free exercise right is violated is a matter of semantics. *See Mack v. O'Leary,* 80 F.3d 1175 (7th Cir.1996), *vacated* in light of *City of Boerne v. Flores,* 521 U.S. 507, 117 S.Ct. 2157, 138 L.Ed.2d 624 (1997). While slightly differentiating from the Eleventh Circuit's definition of "substantial burden," the court in *Mack* noted that an intercircuit split had not been recognized. *Mack,* 80 F.3d at 1178.

The Fourth, Ninth, and Eleventh Circuits define "substantial burden" as one that either compels the religious adherent to engage in conduct that his religion forbids (such as eating pork, for a Muslim or Jew) or forbids him to engage in conduct that his religion requires (such as prayer). *Goodall by Goodall v. Stafford County School Board,* 60 F.3d 168, 172–73 (4th Cir.1995); *Cheffer v. Reno,* 55 F.3d 1517, 1522 (11th Cir. 1995); *Bryant v. Gomez,* 46 F.3d 948 (9th Cir.1995) (per curiam). The Eighth and Tenth Circuits use a broader definition— action that forces religious adherents "to refrain from religiously motivated conduct," *Brown–El v. Harris,* 26 F.3d 68, 70

*Cheffer,* 55 F.3d at 1522,[25] it is noted that when considering a claim by Islamic inmates that their First Amendment rights were violated because they could not attend Jumu'ah, the Supreme Court in *O'Lone* considered that attendance was "commanded by the Koran" and that their "sincerely held religious beliefs compelled attendance at Jumu'ah." 482 U.S. at 345, 107 S.Ct. at 2402.

Using that language as guidance, evaluation of Plaintiff's claims will consider whether Plaintiff has demonstrated that the Department's policies have significantly interfered with or burdened a practice of his religion or prevented him from engaging in conduct or having a religious experience which his faith compels. "[T]he First Amendment is implicated when a law or regulation imposes a substantial, as opposed to inconsequential, burden on the litigant's religious practice." *Levitan v. Ashcroft,* 281 F.3d 1313, 1320 (D.C.Cir.2002)(noting that the substantial burden "requirement accords with the Supreme Court's discussion in *O'Lone,* which assumed the importance of the relevant ritual to the prisoners."), *citing O'Lone,* 482 U.S. at 351, 107 S.Ct. at 2405–06.

▮ If it is found that Plaintiff has been substantially burdened, the Court must then apply the reasonableness test of *Turner v. Safley* to determine whether the position of the Department of Corrections can be upheld as reasonably related to a legitimate penological interest. *O'Lone,* 482 U.S. at 349, 107 S.Ct. at 2404–05. The *Turner* standard employs four factors which are used to determine the reasonableness of a challenged prison regulation or policy. "First, there must be a 'valid, rational connection' between the prison regulation and the legitimate governmental interest put forward to justify it." *Turner,* 482 U.S. at 89, 107 S.Ct. at 2262, *citing Block v. Rutherford,* 468 U.S. 576, 586, 104 S.Ct. 3227, 3232, 82 L.Ed.2d 438 (1984). If the "asserted goal is so remote" from the regulation such that it appears "arbitrary or irrational" or if the "governmental objective" is not a "legitimate and neutral one," the regulation or policy cannot be sustained as constitutional. 482 U.S. at 89–90, 107 S.Ct. at 2262. The remaining factors are: "(2) 'whether there are alternative means of exercising the right that remain open to prison inmates'; (3) 'the impact that accommodation of the asserted constitutional right will have on guards and other inmates, and on the allocation of prison resources generally'; and (4) whether there are 'ready alternatives' available 'that fully accommodate the prisoner's rights at de minimis cost to valid penological interests.' " *Spies v. Voinovich,* 173 F.3d 398, 403 (6th Cir.1999), *quoting Turner,* 482 U.S. at 90–91, 107 S.Ct. 2254, 96 L.Ed.2d 64. The Court is "not required to weigh evenly, or even consider explicitly, each of the four Turner

(8th Cir.1994), or that "significantly inhibit[s] or constrain[s] conduct or expression that manifests some central tenet of a [person's] individual beliefs," *Werner v. McCotter,* 49 F.3d 1476, 1480 (10th Cir.1995), imposes a substantial burden on the exercise of the individual's religion. The Sixth Circuit seems to straddle this divide, asking whether the burdened practice is "essential" or "fundamental." *Abdur–Rahman v. Michigan Dept. of Corrections,* 65 F.3d 489, 491–92 (6th Cir.1995). 80 F.3d at 1178. The *Mack* court, while pointing out that it was not "clear that any of the holdings ... [were] inconsistent," went on to hold that "a substantial burden on the free exercise of religion, within the meaning of [RFRA] is one that forces adherents of a religion to refrain from religiously motivated conduct, inhibits or constrains conduct or expression that manifests a central tenet of a person's religious beliefs, or compels conduct or expression that is contrary to those beliefs." 80 F.3d at 1179. This definition of substantial burden is a logical expression of what seems to be implicit within those words.

**25.** *Cheffer* was based on a RFRA claim.

factors." *Spies*, 173 F.3d at 403, *citing Scott v. Mississippi Department of Corrections*, 961 F.2d 77, 80 (5th Cir.1992).

### Holy Ground

■ Plaintiff has not pointed the court to Rule 56 evidence that he could not engage in other religious practices and express his faith without Holy Ground, or that Holy Ground is so essential to the practice of his faith that its absence would be a substantial burden upon the exercise of his religion. Thus, there is no evidence that denial of Holy Ground violates the First Amendment. Summary judgment should be granted in Defendants' favor.

Even if denial of a designated Holy Ground substantially burdens the exercise of Plaintiff's religion, the burden is reasonable. Plaintiff's request for a designated place of "Holy Ground" was denied because allowing "a specific group to restrict attendance or participation in a religious service or activity in a specialized area of the compound not accessible by other offenders" would "create discord throughout the excluded inmate population." The response is premised upon legitimate penological concerns. A particular prison may be situated on a large number of acres, but the portions of the land where prisoners are allowed to move are usually very limited by fences, sidewalks, buildings, and rules. In a prison system as large as the State of Florida's system, there are many religions. The prisons cannot be expected to set aside and police patches of land for every religious sect.

The comparison to the religious program at Tomoka Correctional Institution is inapt. It is undisputed that that one-year pilot program was not funded through the Department of Corrections' budget, relied upon community volunteers, did not require partitioning off exclusive use space, and did exclude correctional officers or other persons from the housing area. Plaintiff has not shown that his request to establish a Native American Holy Ground is comparable either in genesis or scope. Consequently, summary judgment should be granted all Defendants as to this claim.

### Smudging

There is no evidence showing the importance of smudging to Plaintiff's Native American faith or that smudging is so essential that its absence would be a substantial infringement.[26] The claim fails for this reason.

Further, smudging is an act that entails the burning of sage, cedar, or sweetgrass and using a feather or fan to direct the smoke over the body. Such an act presents two fairly obvious security concerns: a risk of fire and concealment of the smell of burning marijuana or crack cocaine. Those security risks justify the reasonable restrictions on smudging ceremonies which have been implemented by Defendants, that is, limiting smudging to group worship under supervision. For both reasons, summary judgment should be entered in favor of Defendants.

### Prayer Pipe

Plaintiff has submitted evidence that the Prayer Pipe is a significant practice of his faith. Indeed, the 1995 Chaplaincy memorandum describes this practice as being "of the utmost importance to spiritual observance." That memorandum also recognized that "[f]or most Native Americans, the Sacred Pipe Ceremony is the central, most important religious observance." *Id.* Defendants' summary judgment motion does

---

**26.** There is also no need to separately address the denial of smudging opportunities prior to the Department of Corrections amended Native American Guidelines which became effective on August 25, 1999, because Plaintiff has not presented evidence showing that this deprivation was a significant infringement on the free exercise of his religious faith.

not dispute that this is a "central, important observance." *Id.* Because this ritual is unquestionably important and crucial to Plaintiff's Native American religion, the denial of this observance would be a significant burden on the expression of Plaintiff's religious practice. The question here is whether Defendants are responsible for the fact that Plaintiff was not afforded the opportunity to practice this religious ritual.

There is evidence that getting someone from outside the prison to come in and conduct this ceremony failed. When the Native American Pilot Project began in 1996, a Native American Religion Advisor was located to come every other week to conduct religious ceremonies at Liberty Correctional Institution. However, that individual only came six times, and there is no evidence that a pipe ceremony was conducted. Another religious advisor came for a visit on June 19th, but again, there is no evidence of a pipe ceremony. On January 15, 1998, Debbie Pierce conducted a Native American ceremony at Liberty Correctional Institution, yet there is still no evidence that a pipe ceremony took place. *Id.* By the time Defendant Mears and Chaplain Pipping issued a memorandum on February 22, 1998, it was evident to prison officials that there was "no program for the Native Americans of any sort, religious or cultural."

On July 18th, Two Crow Allard came to Liberty Correctional Institution to conduct a pipe ceremony. Although the record is unclear as to whether he smoked the ceremonial pipe with only those he considered "truly Native American" or whether he refused to have the pipe ceremony at all, there is no evidence that he came more than this one time. From this evidence, then, it appears that Plaintiff *may* have been able to participate in one pipe ceremony and, as Defendants admit in the summary judgment motion, there has not been a pipe ceremony since July 18, 1998. *See* doc. 85, p. 23. Thus, the evidence reveals only one pipe ceremony in approximately five years.

█ But the evidence also reveals that Defendants made a reasonable effort to find someone from the outside to come into the prison to provide this service on a regular basis and, more important, did nothing to impede Native American practitioners from coming into the institution. Defendants do not have the obligation to hire a minister of every faith to conduct religious services for prisoners, nor do they have the obligation to drum up volunteers. It is enough if they do not impede a prisoner's effort to have contacts with someone from the outside who is willing to bring an important religious ceremony into the prison.[27] Summary judgment should be granted in favor of Defendants on this aspect of the prayer pipe claim.

Plaintiff has presented evidence that a prayer pipe is used for private prayers as well as for group prayers. Doc. 215, affidavit of Kim Foltz. Further, there is some authority that another prisoner may serve as pipe bearer if an outside pipe carrier is not available. *See, e.g., Allen v. Toombs,* 827 F.2d 563, 656–566 (9th Cir. 1987) (weekly pipe ceremonies are permitted and are "conducted either by a religious leader from outside the penitentiary, or" if such a volunteer is unavailable, "the ceremony is conducted by an inmate spiritual leader."); *McElhaney v. Elo,* 202 F.3d 269, 2000 WL 32036, at *4 (6th Cir.2000) (noting that if outside volunteers could not be found to lead pipe services, a "desirable alternative" might be to permit a trained inmate to do so). Outside volunteers could

---

27. There is evidence that one volunteer was offered but never called. That, standing alone, does not present a triable issue.

not be found to lead pipe services, a "desirable alternative" might be to permit a trained inmate to do so).

 Plaintiff has not, however, clearly claimed a right to have personal possession of a prayer pipe in his housing area. In Plaintiff's grievance of November 16, 1995, he asks that arrangements be made for "a Native American volunteer to come to Hamilton C.I. Annex to conduct a Pipe Ceremony." Doc. 141, ex. C. In a grievance dated January 1, 1999, Plaintiff asked that a prayer pipe and tobacco be allowed into the institution to be stored in the chapel. *Id.* There is no indication, however, that Plaintiff himself was to have access to the pipe without supervision. In a grievance dated December 13, 1999, Plaintiff speaks about "when and if a Pipe Holder comes to perform a ceremony at Hamilton C.I. . . . ." *Id.*

If Plaintiff had demanded that he be permitted to have personal possession of a prayer pipe in the housing area, for daily use, the claim would fail. There is evidence in the file that a prayer pipe is sacred. "It should not be touched by anyone other than the owner or someone familiar with the spiritual teachings of the Native American faith." *Id.*, affidavit of Kim Foltz. If such a sacred object were to be allowed into the housing area, the owner of the pipe would have a perfect place to hide small items of contraband.

The refusal of Defendants to permit personal possession of a prayer pipe is based upon legitimate and reasonable penological concerns. To the extent that this is Plaintiff's claim, summary judgment should be granted to Defendants.

 This leaves for consideration Plaintiff's claim that he should be permitted to keep a prayer pipe in the chapel for private or group prayer, under supervision.[28] Defendants point out that prison chapels do not even store sacramental wine for use in communion services. Doc. 85, p. 32. They argue that storage in the chapel is not needed since a volunteer may bring the pipe into the institution for a ceremony. *Id.* Elsewhere in the file there is the assertion that chapels do not have enough room to store a prayer pipe and similar sacred objects. Perhaps this is so, but a trial is needed to explore this assertion. On its face, this seems to be an exaggerated response. A prayer pipe cannot take up too much room in the chapel, especially since drums are sometimes stored in the chapel. Further, it appears undisputed that it is very difficult to find a Native American pipe carrier to bring a prayer pipe into the prison. This is quite different from a Christian celebrant bringing Holy Communion to prisoners. The court suspects that there are many more Christian volunteers available to bring communion to prisoners than there are

---

**28.** Most of the evidence focused upon having someone come from the outside to conduct a pipe ceremony. As noted above, in summarizing Native American beliefs, Tyrone Boyd said that a "pipe ceremony is conducted by a Native American spiritual leader." *Id.*, Ex. F. Mr. Peacock's letter July 9, 1997, to the American Indian Movement of Florida assumed that someone from the outside was needed to conduct the pipe ceremony. On June 10, 1998, the American Indian Movement of Florida recommended Two Crow Allard as a volunteer for the Native American program. Mr. Allard "conducted a scheduled program" on July 18th, but he "refused to smoke the ceremonial pipe with those he considered non-Native American." October 8, 1998, Defendant Mears wrote a letter to Defendant Boyd and stated that earlier that day he had spoken with Dr. Rick Knight, a Native American Cultural Leader, about finding "a pipe-carrier to participate in" the Institution's Native American program. Dr. Knight replied by letter that he was having difficulty finding a "traditional pipe carrier," implying that there is a tradition about who may carry the pipe.

Native American pipe carriers. Summary judgment should be denied to this extent.

### Sweat Lodge

■ There is no dispute that Plaintiff has been denied the construction and use of a sweat lodge. Plaintiff has presented evidence that the ceremonial sweat lodge is an important and sacred part of his Native American spirituality. Thus, this claim must be evaluated under *Turner*.

Defendants have presented security reasons for denial of a sweat lodge. First, there is evidence that exclusive use of an area for one group of inmates could create discord and unrest among the excluded offender population. The chapel is not an area of exclusive use. Though not argued by Defendants, the court can see how non-Native Americans might view this as a sauna and would demand their own. Second, a sweat lodge, by definition, is an enclosed, dedicated structure. Like Holy Ground, the "sacred" nature of this area would restrict access of prison officials, eliminating unannounced or random searches, thereby increasing opportunities for contraband or rule violations and reducing effective means for officials to monitor inmate behavior and to keep the prison environment secure. Third, there is concern over permitting fires on institutional grounds. While Plaintiff has provided evidence that sweat lodges are permitted in other institutions in other states, he has not shown that *this* regulation is an exaggerated response to valid prison concerns.

Admittedly, as noted *supra*, Native American inmates do not appear to have many alternative means of exercising their faith beyond reading books, but that finding alone is insufficient to overcome Defendants' security interest. Furthermore, there is evidence that operation of a sweat lodge would require constructing and securing storage facilities, create additional burdens for correctional officers, and would take from scarce prison resources. Accommodating this religious expression would cause a burden to Defendants. Moreover, Plaintiff has not come forward with evidence of ready alternatives that are available that would accommodate Plaintiff's rights at a *de minimis* cost. Defendants' motion for summary judgment should be granted as to this claim.

### Headbands

Plaintiff has presented evidence that while Native Americans are denied the right to wear headbands routinely, Jewish and Muslim inmates are allowed to wear their headgear at all times. This is part of the equal protection claim which should go forward.

■ As a First Amendment claim, Plaintiff has demonstrated that wearing a headband is significant to his faith and that, prior to issuance of Policy 503.001 in August of 1999, Plaintiff's request to wear a headband was denied. After the policy was issued, Plaintiff was allowed to wear a headband during religious services. In light of the evidence showing the minimal number of services, that does not appear to be much time.

Furthermore, in light of ability for other religious faiths to wear their religious headgear at all times, the security interest put forward by Defendants appears to be an exaggerated response. At least on this record there has not been any showing that Native American prisoners are a security risk as gang members, or that the headband which Plaintiff wishes to wear resembles any sort of headgear worn by gang members. The size, shape, and color of a Native American headband can be regulated so that it does not resemble a bandana or any other headgear associated with gang membership. Defendants motion for summary judgment concerning

this claim does not satisfy the *Turner* factors and should be denied.

### Hobby Craft Shop

 Defendants have presented evidence showing a valid security interest supporting the denial of providing a shop for craft work for Native American worshipers. However, Plaintiff has come forward with additional evidence showing that tools similar to those used in the craft shop are provided to inmates at work with minimal supervision. There is also evidence that a hobby craft shop is in existence at Sumter Correctional Institution that is open to all inmates.

Yet, absent from Plaintiff's evidence is a demonstration of the importance of craft work to Plaintiff's Native American faith. There is evidence that significant *art* was created, but no evidence as to the connection to the faith. Without evidence showing that access to craft making is so essential that its absence would be a substantial infringement on Plaintiff's right to religious expression, this claim must fail and Defendants' motion for summary judgment should be granted.

### Sacred Drum and Rattles

 The evidence reveals that drums are permitted and may be donated to a correctional institution, to be stored in the chapel. Drums and rattles cannot be personal property of an inmate, and use is limited to Native American group or prayer circle meetings. This, on its face, is a reasonable limitation. Drums and rattles presumably are used during collective spiritual ceremonies, not for individual prayer, though Plaintiff has presented no evidence on this. Further, if needed for individual prayer, use of drums or rattles in a housing area for individual prayer could become unreasonably disruptive for other

prisoners. Plaintiff has not come forward with evidence showing a substantial infringement upon the exercise of his religion. Defendants' motion for summary judgment should be granted on this claim.

### § 1985(3) Claim

 To establish a § 1985(3) conspiracy claim, Plaintiff "must show an agreement between 'two or more persons' to deprive him of his civil rights." 42 U.S.C. § 1985(3), *interpreted in Dickerson v. Alachua County Com'n,* 200 F.3d 761, 767 (11th Cir.), *cert. dismissed,* 530 U.S. 1285, 121 S.Ct. 1, 147 L.Ed.2d 1025 (2000). On remand, Plaintiff has argued that he has provided evidence of a conspiracy between Department of Corrections employees, including Boyd, Mask, Mears, and others.[29] Plaintiff's evidence of the conspiracy is drawn from the Department's internal investigation. Doc. 141, ex. H. That investigation centered only upon the creation of a fence for a Holy Ground and on a Hobby Craft Shop. Plaintiff's evidence has been insufficient to support individual First Amendment claims concerning deprivation of a Holy Ground or access to crafts. Thus, the conspiracy claim cannot succeed either. Defendants' motion for summary judgment should be granted on this § 1985 claim.

### § 1986 Claim

 Section 1986 conspiracy claims are "derivative of § 1985 violations." *Park v. City of Atlanta,* 120 F.3d 1157, 1160 (11th Cir.1997). Because Plaintiff's § 1985 claim is insufficient to sustain a First Amendment claim, the § 1986 claim must fail as well. *See Denney v. City of Albany,* 247 F.3d 1172, 1190–1191 (11th Cir.2001). Defendants' motion for sum-

---

**29.** Plaintiff also contends there was a conspiracy with two other Department of Corrections' employees, Russell Smith and Chaplain Whitley Ring. Those persons are not named Defendants in this case and thus no claims pending against them.

mary judgment must be granted on this claim.

## Qualified Immunity

Qualified immunity protects a government official who was performing discretionary functions from an award of civil damages in a § 1983 action unless the official violated "clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald,* 457 U.S. 800, 818, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982). The first step is to "determine whether the plaintiff has alleged the deprivation of an actual constitutional right at all, and if so, proceed to determine whether that right was clearly established at the time of the alleged violation." [30] *Conn v. Gabbert,* 526 U.S. 286, 290, 119 S.Ct. 1292, 1295, 143 L.Ed.2d 399 (1999), *citing Siegert v. Gilley,* 500 U.S. 226, 232–233, 111 S.Ct. 1789, 114 L.Ed.2d 277 (1991), and *County of Sacramento v. Lewis,* 523 U.S. 833, 841, n. 5, 118 S.Ct. 1708, 140 L.Ed.2d 1043 (1998). In rejecting the previously rigid analysis of a qualified immunity defense as enunciated by the Eleventh Circuit, the United States Supreme Court has held that qualified immunity does not require that there be materially similar cases, only that the unlawfulness of an act or omission be apparent in light of preexisting law. *Hope v. Pelzer,* 536 U.S. 730, 122 S.Ct. 2508, 2516, 153 L.Ed.2d 666 (2002), *reversing Hope v. Pelzer,* 240 F.3d 975 (11th Cir.2001). Accordingly, the question to ask is whether prison officials have been given fair warning that their actions or omissions are unconstitutional. *Id.*

■ There is virtually no caselaw governing the claims made in this case. None of the First Amendment claims made by Plaintiff are founded upon clearly established law. Consequently, the Defendants all have qualified immunity from an award

of any damages at all, including nominal damages. *Fox v. Board of Trustees of State Univ. of N.Y.,* 42 F.3d 135, 141–142 (C.A.2 1994), *cert. denied,* 515 U.S. 1169, 115 S.Ct. 2634, 132 L.Ed.2d 873 (1995) (nominal damages would be precluded by qualified immunity). Summary judgment should be granted in favor of Defendants on all of the First Amendment claims.

## State Law FRFRA Claim

■ Since the equal protection claims are still pending, the court must consider whether to exercise jurisdiction over the state law claim. Plaintiff's state law claim asserts a violation of Florida's Religious Freedom Restoration Act, FLA. STAT. § 761.03. The law provides that government shall not "substantially burden a person's exercise of religion" except when the government "demonstrates that application of the burden to the person: (a) Is in furtherance of a compelling governmental interest; and (b) Is the least restrictive means of furthering that compelling governmental interest." FLA. STAT. § 761.03.

Defendants contend that this Court should decline to exercise supplemental jurisdiction over this claim because it "raises novel and complex issues of state law" that should be "tested in Florida's own courts." Doc. 85, p. 36. Defendants argue that "with specific regard to incarcerated persons, the Florida RFRA uses a 'substantial penological interest' test along with a 'least restrictive means' test." Doc. 85, p. 37. Thus, it is asserted that until a Florida Court has interpreted what the Florida RFRA's means by a "substantial penological interest," this Court should abstain. *Id.*

The statute prohibits government from substantially burdening the free exercise of religion without compelling justification,

---

**30.** It is this first step which has been considered in the preceding pages.

and provides that any burden imposed must be "the least restrictive means of furthering that compelling governmental interest." FLA. STAT. § 761.03(1)(b). There is nothing particularly novel here. These phrases have been used for a long time in the application of the First Amendment.

One state case has applied Florida's RFRA to a state prisoner who changed his name for religious reasons. *Yasir v. Singletary*, 766 So.2d 1197 (Fla. 5th DCA 2000), *review denied* 789 So.2d 352 (Fla. 2001). The plaintiff legally changed his name, but the Department of Corrections forfeited sixty days gain time "for using his new religious name in conjunction with his committed name (Randy Ferguson) on official documents." 766 So.2d at 1198.

> The DOC's position appears to be that it was entitled to insist that Yasir use his original committed name until the Department recognized the name change by changing his committed name to Yasir. Yasir seems to be arguing that the DOC was required to recognize his new legal name as his committed name (or to allow him to use his new legal name in conjunction with his committed name) as soon as he gave his probationary officer a certified copy of the court order changing his name . . . .

766 So.2d at 1198. The court concluded that "prison officials ha[d] the right to impose reasonable limitations on institutional uses of changed names, whether the change was religiously motivated or not." 766 So.2d at 1198.

In support of that conclusion, the court cited *Turner v. Safley, supra,* and *O'Lone v. Estate of Shabazz, supra* (other citations omitted). The court also found that the Department's requirement that a changed name "be administratively processed prior to the prisoner being allowed to travel under [a] new name [was] reasonable." 766 So.2d at 1198. The court then found

that the plaintiff did not allege "that there [was] no reasonable mechanism to administratively implement a name change or that the procedures which [were] in place [lacked a] rational relationship to a legitimate penological interest." 766 So.2d at 1198–1199. The case, therefore, suggests that a different standard of review was implemented than appears in the text of the statute. A "reasonable" or "rational" standard of review would not seem to be what was contemplated in the language of the statute and, moreover, *Turner* expressly disavowed using a "least restrictive means" test. 482 U.S. at 90, 107 S.Ct. at 2262.

It is also noted that in *Warner v. City of Boca Raton*, 267 F.3d 1223 (11th Cir.2001), the Eleventh Circuit certified questions to the Florida Supreme Court concerning whether Florida's RFRA broadened the definition of what constitutes religiously motivated conduct protected by law "beyond the conduct considered protected by the decisions of the United States Supreme Court." 267 F.3d at 1227. The certified questions were:

> 1. Does the Florida Religious Freedom Restoration Act broaden, and to what extent does it broaden, the definition of what constitutes religiously motivated conduct protected by law beyond the conduct considered protected by the decisions of the United States Supreme Court? and
>
> 2. If the Act does broaden the parameters of protected religiously motivated conduct, will a city's neutral, generally-applicable ordinance be subjected to strict scrutiny by the courts when the ordinance prevents persons from acting in conformity with their sincerely held religious beliefs, but the acts the persons wish to take are not 1) asserted or implied in relatively unambiguous terms by an authoritative sacred text, or 2)

clearly and consistently affirmed in classic formulations of doctrine and practice, or 3) observed continuously, or nearly so, throughout the history of the religion, or 4) consistently observed in the tradition in recent times?

It does not appear that the certified questions have been answered. The Court stated: "As the circumstances of this case demonstrate, the breadth of protection afforded by the State of Florida under state law can determine the outcome of this case as well as have wide ranging and profound implications in Florida." *Id.* In light of the fact that the Eleventh Circuit certified questions to the Florida Supreme Court for review, and because that court sought "clarification (and possibly correction)," it is plain that Florida law is too unsettled to be applied with any confidence by this court. Thus, this court should decline to exercise jurisdiction over the state law claims.

### VI. Conclusion

Accordingly, it is **RECOMMENDED** that Defendants' motion for summary judgment, doc. 85, be **GRANTED in part**, that all claims for injunctive or declaratory relief be **DISMISSED**, that judgment be entered for Defendants on the § 1983 First Amendment and §§ 1985 and 1986 claims, that summary judgment be **DENIED** on the § 1983 equal protection claims, that the court **DECLINE** to exercise jurisdiction over the state law claim, and that the case be **REMANDED**.

March 11, 2003.

### *NOTICE TO THE PARTIES*

A party may file specific, written objections to the proposed findings and recommendations within 15 days after being served with a copy of this report and recommendation. A party may respond to another party's objections within 10 days after being served with a copy thereof. Failure to file specific objections limits the scope of review of proposed factual findings and recommendations.